ORAN Dow, Appellant, v. NADINE Dow, now known as NADINE Dow WHITE, Appellee.

No. 47326.

(Reported in 35 N. W. 2d 853)

FEBRUARY 8, 1949.

Ted Sloane and Ralph L. Powers, both of Des Moines, for appellant.

Carl A. Burkmàn, of Des Moines, for appellee.

MULRONEY, J.—On September 4, 1946, Oran Dow was granted a divorce from his wife, Nadine. The record shows she made no resistance to her husband's divorce suit, and both she and her attorney made written approval of the form of the decree. This decree awarded the custody of their six-year-old

son, Larry, to the father, reserving to the mother the right to have possession of the child during summer vacations, designated at approximately from June 15 to August 15 of each year, and reserving to each party the right to visit the child at reasonable times when he was in the possession of the other party. The decree further provided the child was to stay at the home of plaintiff's sister, Mrs. Crowder, until further order of the court. An earlier hearing in the divorce action in April of 1946 had resulted in an order placing the child temporarily with Mrs. Crowder.

Three days after the divorce Nadine married Alfred White and about four months later (January 11, 1947) she filed her application to modify the decree of divorce as to the custody of Larry. She alleged a change of circumstance in that she had remarried since the divorce decree and she and her husband had a good home in Davenport; that her husband earned between four and five hundred dollars a month; and that she and her husband were willing and eager to provide for and rear the child and give it every educational and cultural advantage. The application further alleged the child was not properly clothed, fed, and cared for in the Crowder home and it would be for the best interest of the child that she be awarded its custody.

The husband's resistance denied the material portions of the application and the hearing resulted in an order on February 18, 1948, modifying the divorce decree and awarding the permanent custody of the child to Nadine and granting the father custody of the child from June 15 to August 1 of each year "upon his establishment of a home of his own." As will appear later the evidence showed the father intended to remarry. The father appeals to this court asserting in effect that the evidence was insufficient to support the trial court's ruling. No brief or argument has been filed by the mother.

Nadine testified that she was living in Des Moines with her husband at the time he left for service and that after he left she lived for a short time in Des Moines and then went to Cedar Rapids where she worked and the baby was placed in a day nursery. Nadine's mother lived in Cedar Rapids but

Nadine did not live with her. In January of 1946, she decided to ride to Florida with one Gene Buri, a young sailor home on a furlough, who she said was a "very, very good friend of mine" and with whom she had "kept company"—going to dances and shows with him—but she said her mother always accompanied her when she went with Buri. She called her husband's sister, Mrs. Crowder, in Des Moines and asked her if she would take Larry while she went to Florida. Mrs. Crowder said she would take care of Larry, and Nadine and Buri came to Des Moines with Larry on the bus and left him at Mrs. Crowder's home and they returned to Cedar Rapids and Nadine and Buri drove to Raleigh, North Carolina, and Nadine then took the train to Florida. She testified the trip to Florida was for her health and that she returned in March.

Two ladies testified that Nadine was a good mother to her child. One lady had never been in Nadine's home until after she had married White and her opinion was based on observing Nadine and Larry on their visits to Nadine's mother's home in Cedar Rapids. The other lady rented an apartment to Nadine and Oran Dow after they were married and she saw them for the two years they lived in her apartment.

Alfred White, who is twenty-five years old, gave rather confusing testimony with respect to his earnings and income but it fairly appears that he has a selling job, earning from $80 to $100 a week; that he has paid about $800 on a home in Davenport worth about $8000; and that he has about $1000 in the bank. The child had visited in this home and White testified he would be willing to have the child in his home and he would be able to pay for the support and education of the child.

A member of the juvenile court department of Polk county testified Nadine had become a ward of the juvenile court upon a complaint of dependency and improper guardianship in 1930; had been placed in St. Monica's Home in Des Moines in 1931, and released to her mother in 1934; that her progress had been good in the school, but in 1935 seemingly because of irregular school attendance she was committed to the Girls Training School at Mitchellville and paroled under good behavior. In 1936, Nadine had some trouble with her stepfather and was placed in the Home of the Good Shepherd at Omaha and re-

leased to her parents in 1937. In January of 1938, her parole to the girls training school at Mitchellville was revoked upon application of her mother and stepfather. Nadine had married while under age and her mother felt she could not give her the necessary supervision. Nadine, then about eighteen years old, went to Mitchellville and stayed about fifteen months in the training school and the school's reports on her were good. Shortly after she left the school she married Oran Dow.

The father testified that he and Nadine had not gotten along very well before he left for service and that after he was in service about six weeks he had a letter from her requesting a divorce. He wrote refusing to grant her a divorce unless he received custody of the child. There the matter rested until he got out of service and came back to Des Moines in January of 1946, a day or two after Nadine had left Larry with his sister, Mrs. Crowder. The father immediately filed suit for divorce. The child remained with Mrs. Crowder and the father lived there for a couple of months. He was sleeping on the davenport in the Crowder home so he moved to a room of his own—evidently in a house near the Crowder home. He saw his child nearly every night, took him to shows and out to dinner, and spent every week end at the Crowder home with him. He took the boy to a doctor immediately and had him treated for a run-down blood condition, and later had his tonsils removed. He paid Mrs. Crowder a dollar a day for Larry's keep and in addition furnished clothing and medical attention. The father took an interest in his schooling; talked to his teachers and the principal of the school. Larry seems to be a somewhat mischievous youngster and he would get into trouble on the way to and from school and his father cured that by hiring an older boy, at fifty cents a week, to take Larry to and from school. The father had not remarried but he testified he planned to marry in April of 1948 and that his fianceé had seen about as much of Larry as he had and frequently she had taken Larry out to dinner and to a movie when he had to work.

There was much testimony by the father and Mr. and Mrs. Crowder that when the boy visited Nadine in Davenport he would be hard to handle when he returned; that he had an

indignant attitude; that he would not pay any attention to what they would say to him; and that he would ignore correction. Mr. Crowder testified about how the boy would act after visiting Nadine or after she had talked to him on the telephone. He would say "My mother don't make me do this" or "My mother told me I don't have to mind you," and he said the boy told him that she was going to put him in school in Davenport and that they had a very nice school with a swimming pool and better teachers, and that he was going to live with his mother. The mother bought him a tricycle while he was in Davenport, but kept it there when Larry went back to Des Moines and he said she promised to get him roller skates and a pony. Mr. Crowder said it would be two or three weeks before the boy would get straightened out and start behaving himself. On one occasion when the Whites had come to Des Moines to visit Larry the father talked to Nadine and her husband before they went to the Crowder home and told them the child was using his mother as an out and was telling them all the things he could do in Davenport and he urged Nadine to forget their differences and work for the best interests of the child.

There was other testimony of women with whom Nadine lived while her husband was in service, to the effect that she did not take good care of Larry. There was also testimony that she went out a good deal while her husband was in service and she told one of the women that she had had intimate relations with the woman's brother-in-law. Although Nadine testified in rebuttal, she did not deny this conversation.

The trial court in its findings of fact detailed his interview with Larry. The court stated:

"I talked to the child and the boy is a bright boy. He was perfectly at ease talking to me, although he had not seen me or didn't know what he was in there for. * * * He is smart and he is bright. In fact I thought he was a little brighter than the average child in my conversation with him. * * * He said he loved his father, that his aunty was good to him and that he loved his mother * *. * he is an observing child. I talked to him in a general vein and I asked him if he liked

to live out here. 'Yes,' he says, 'but I haven't any playmates out there [Crowder's] except a little four-year-old girl' [the Crowder's only child] and he says 'of course you can't play much with a girl of that age.' He said he had two or three boy friends at Davenport that he liked to play with. * * * He said he would rather live with his mother. I said, 'How about your father?' and he said, 'No, I would rather live down there.' I said, 'Why, do you feel closer to your mother, do you feel more at home there?' He said he did."

The court's findings go on to state that the court realizes the past history of the mother is not very good but the fact that "the mother of a child has gone the wayward path before she was married and after she was married" does not "necessarily add up that she is not or could not be a good mother when she is in a proper position to do so." The court stated he could not "get away from the feeling," which might be an "innate feeling," that the welfare of the child would "be better served with it in the custody of the mother."

The power of the courts to change the custodial relationship once established by a divorce decree is dependent upon a finding of subsequent circumstances that render a change of custody expedient. Section 598.14, Code, 1946. Wood v. Wood, 220 Iowa 441, 262 N. W. 773. But the new order for custody, like every order for the custody of a child, must be for the best interest of the child. Freese v. Freese, 237 Iowa 451, 22 N. W. 2d 242.

The only subsequent circumstance in this case is the mother's remarriage and the establishment of a home. We know from the record she remarried three days after the divorce decree— a decree that gave custody of Larry to the father and a decree which bears her written approval as to form. The record shows she had been keeping company with White and intended to marry him just as soon as she got her divorce. We do not know when the home in Davenport was purchased but it was sometime during the four-month period after the divorce and before the application for modification was filed. While precedents are not of great value when the superior question concerns a

child's welfare, we have held that a trial court was right in not changing an order that gave the father custody, upon a showing that the mother had remarried and established a home and had financial ability to support the child. Daniels v. Daniels, 145 Iowa 422, 124 N. W. 169; Freese v. Freese, supra. In many respects the case is much like Wiggins v. Wiggins, 239 Iowa 1279, 34 N. W. 2d 607. But it must be admitted that the mother's remarriage and the establishment of a home is some change in the circumstances as they existed at the time of the divorce. The only question is whether, under all of the testimony, these circumstances render "expedient" a change of custody. We said in Neve v. Neve, 210 Iowa 120, 125, 230 N. W. 339, 341:

"Mere subsequent facts and circumstances are not enough. The subsequent facts and circumstances must be of such character as to render expedient a change in the original judgment and decree. Thus appellant must prove that such subsequent facts and circumstances affect the well-being of the children, and demand a change in their custody."

In other words, the only question in the case is whether it would be for the best interest of Larry to place him with his mother in this home which she has now established in Davenport. The trial court felt it would and, though the case is here de novo, his finding is entitled to weight in this court. Maron v. Maron, 238 Iowa 587, 28 N. W. 2d 17. It would perhaps be given more weight here if the court had referred to testimony or pointed out why he thought Larry would be better off if placed in the custody of his mother. The evidence is overwhelming that the boy is being properly cared for under the original order that placed the boy in his father's custody and temporarily in his aunt's home. It seems to us far too soon to change the original order of custody without some clear showing that the changed order will result in a distinct improvement in the boy's welfare. No such showing is made in this case. We can agree with the trial court that the mother's past record does not necessarily mean she could not be a good mother to her son now that she has a home but this is not the time to gamble

about the child's welfare. We know from this record that the child is adequately cared for and supervised under the original order by his father whom he loves and by his aunt who he says is good to him. All that we can find in the mother's favor under this record is that he might be adequately cared for and supervised by her if placed in her custody. But past actions are certainly some indication of probable future conduct. There is a good deal of evidence that she did not take very good care of him when he was with her and it is undisputed that he arrived at the Crowder home pale and sickly and in need of a doctor's care when she left for her Florida trip. The trial court in his findings said:

"I think possibly the child was neglected some before the mother got into a position where she could take [care of] him and I think at that time her interests were not centered in the child. In fact she had a divided attention. Her attention was divided between the child and running around. There is no question in my mind about that."

Clearly this record fails to show a likelihood that his welfare would be improved. In a hearing for a change of custody from the father to the mother we do not indulge in any presumption or inference that a child would be better off in the custody of its mother. Maron v. Maron, supra. Neither do we give much weight to the wish of Larry that he be permitted to live with his mother. He was only six years old at the time of the hearing. We feel he was too immature for his wish to be given much consideration. In re Guardianship of McFarland, 214 Iowa 417, 239 N. W. 702; Brem v. Swander, 153 Iowa 669, 132 N. W. 829. Besides, the boy did not seem to express any prejudice against his father, and the record rather indicates his wish to live "down there" in Davenport with his mother was dictated by an understandable childish desire to live with the more indulgent parent, near boy playmates that he likes.

We have no doubt but that Nadine has genuine affection for Larry. In the original decree she is given liberal visitation rights and the right to have Larry with her during school vaca-

tions. The father seems to have respected those rights granted to her, and he only asked that she lay aside their differences and work with him for the best interests of the child. The love both parents bear for Larry inspires the hope that there will be a suppression of the exploiting of parental power, to gain advantage between parents in the child's affection. For the reasons stated the cause is reversed and remanded for decree dismissing the defendant's application for modification of the divorce decree.—Reversed and remanded.

All JUSTICES concur.