JUDITH K. BELL, by her father, KENNETH C. BELL, natural guardian and next friend, Appellant, v. DOROTHY M. BELL, Appellee.

No. 47432.

(Reported in 38 N. W. 2d 658)

AUGUST 5, 1949.

E. K. Bekman, of Ottumwa, and L. M. Hullinger, of Cedar Rapids, for appellant.

Jordan & Jordan and Dwight Krumboltz, all of Cedar Rapids, for appellee.

SMITH, J.—These parents were married August 2, 1942, when defendant was nineteen and Kenneth about twenty-nine. They lived in California where the child, Judith, was born September 17, 1943. Kenneth, hereinafter called plaintiff, attended the Life Bible College in Los Angeles and after a three-year course was ordained in 1945 as a minister in the church of the Four Square Gospel.

The latter part of March 1944, defendant and Judith went to Memphis, Tennessee, to visit defendant's parents and remained there till August 1, 1944, defendant working as a riveter on the "graveyard" shift in an aircraft war plant. They returned to California by way of Cedar Rapids, Iowa, and rejoined plaintiff about September 1. In January 1945, defendant again went back (alone) to Memphis and on April 17, 1945, gave birth to another daughter, Sandra.

Both prior and subsequent to Sandra's birth plaintiff disclaimed her paternity and accused defendant of intimacy with other men while she was in Tennessee. Plaintiff testifies on this trial that she confessed to him her misconduct, but she strenuously denies both the misconduct and the alleged confession and also another alleged admission testified to by plaintiff's niece.

We may infer the first trip to Tennessee was due, in part at least, to economic conditions, since defendant found employment there and remained all spring and most of the summer. There is no evidence of marital differences up to that time. The second trip back however was doubtless largely due to quarrels over defendant's pregnancy and its cause. Plaintiff testifies: "I sent her back to Tennessee in order to have it [the baby] back there; as long as it was not mine I did not feel as though I could keep it."

On that second occasion defendant did not work but remained with her mother until the second daughter was born.

Defendant's father in the meantime had been transferred back to Cedar Rapids, Iowa, where the family originally lived, the mother remaining to care for her daughter during the birth of Sandra.

The first part of May 1945, defendant returned to plaintiff and Judith, leaving Sandra with her mother who subsequently took the child with her back to Iowa. "I left the child with mother until I could convince him it was his." Plaintiff and defendant (with Judith) thereafter lived together (part of the time in Ohio, where plaintiff had a pastorate, and then back in California) until in November 1946, when defendant took Judith and rejoined her parents and Sandra in Iowa. They left while plaintiff was away at work, leaving a note to him. Defendant claims the note (if produced) would prove they went only to visit and intended to return. Plaintiff however promptly sent their clothes to them and on March 1, 1947, commenced divorce proceedings in California. On August 4, 1947, he obtained an interlocutory decree, subject to being made final at the expiration of one year upon motion of either party or of the court. There was no appearance by defendant. This decree made no order as to custody or care of Judith but merely recites she is "now in the actual physical custody of the defendant outside the limits of the State of California."

The present suit was commenced November 7, 1947. Plaintiff also commenced a divorce suit in Iowa, but the record does not disclose when it was commenced or what if any disposition has been made of it. Plaintiff explained "at the time I understood that custody of a child was granted only through divorce procedure * * *." Evidently it was prior to the commencement of the present suit.

I. Both parties argue the case on the sound and well-established proposition that the welfare of the child is the paramount consideration. The rule is easily stated but difficult to apply. Elements are involved that cannot be accurately known or their effect forecast.

From the standpoint of material well-being we can see little choice here. Both plaintiff and defendant are dependent, and were during their married life, upon their own earnings at

manual labor. Plaintiff worked while studying for the ministry —at times as driver of a truck for the Railway Express and again as a gardener at the general hospital. His income during his brief pastorate in Ohio was pitifully small. He does testify however that when he obtained the divorce he was earning approximately $200 per month as a "heavy equipment operator" and living with his parents in a five-room house and "a guest room that is separate from it." He says there were in the family besides himself, his parents, brother and grandmother.

Defendant testifies on the other hand that when she left California there were nine persons (had been as many as eleven) living in the house that had two bedrooms, living and dining rooms, kitchen and garage (remodeled into a bedroom). She says there were three families cooking on one stove.

Defendant's mother testifies that defendant, Judith and Sandra live with her and her husband in their home in Cedar Rapids: "It is not * * * elaborate * * * but we have a good clean home. It has six rooms and a bath. We don't have a furnace. We have running water. We have a nice large yard. I stay at home and do the housework. Dorothy [defendant] works at Wilson's. * * * By the time she pays her board to us she don't have a lot left—a little bit for clothes."

It appears the two little sisters (Judith and Sandra) play happily together. One witness says: "They seem like they would be lost if they were ever separated * * *." Judith has some physical deformity of legs or body, of a cancerous nature, being treated by a Cedar Rapids physician, with possible surgery in prospect.

We do not have any very definite information as to the financial conditions of Judith's grandparents on either side. All seem to be respectable working people without much of this world's goods. Defendant's father had worked for the Quaker Oats Company for twenty-three years; plaintiff's father is a carpenter and owns his own home. Defendant's parents, at time of trial, were fifty years old, plaintiff's in the "late fifties."

II. Plaintiff's heaviest guns are directed at defendant's moral character, alleged to be such as to disqualify her for the custody of her daughter. He argues the sole question is: "Would the best interests * * * of the child be *equally or better* ad-

vanced * * * by awarding the custody of the child to its father?" We do not deem this an accurate statement of the issue. Our statute (section 668.1, Code, 1946) makes *both* parents the natural guardians of the persons of their minor children and *equally* entitled to their care and custody. Doubtless the statute assumes the continuance of the normal family relation. It contemplates joint custody—a sort of joint tenancy as distinguished from a tenancy in common. The statute breaks down when as here joint custody becomes impossible and controversy arises between parents.

When this happens the one seeking to take actual custody from the other has the burden of showing some superior claim based on his ability to minister, not *equally*, but *more*, effectively to the child's well-being.

Plaintiff seeks to carry this burden by asserting that "defendant is an immoral person and is not a fit or proper person to have the care or custody of said minor child." Again he alleges "that the defendant is a person of very bad character and ill repute, unclean and is not the kind of person to properly care for said child."

These allegations are attempted to be proved by alleged confessions or admissions by defendant to plaintiff and to plaintiff's niece, then a young unmarried woman, temporarily living with plaintiff and defendant. Defendant emphatically repudiates them. She also denies the implication of improper intimacy (after her separation from plaintiff) with a married male witness for plaintiff, who when asked the question point-blank coyly availed himself of his constitutional right not to incriminate himself, but at the same time to besmirch defendant. Such testimony, as indeed all the testimony, may best be appraised by the trial court, who sees the witnesses, observes their appearance and demeanor and is usually in a position to evaluate their testimony more accurately than can the appellate court. We have said a trial court in a case of this character is "vested with some discretion in making its decision and we should not interfere unless it appears there was an abuse of discretion." Maron v. Maron, 238 Iowa 587, 591, 28 N. W. 2d 17, 19, citing cases; and 27 C. J. S., Divorce, section 310.

We are not disposed upon this record to send this four-year-

old child to California away from her mother and little sister. It has been repeatedly said that usually the mother is best fitted to care for children of tender age. Caldwell v. Caldwell, 141 Iowa 192, 195, 119 N. W. 599; Wood v. Wood, 220 Iowa 441, 446, 262 N. W. 773; Maron v. Maron, supra (238 Iowa, at page 591). Unfortunately, perhaps, the court is not able to create conditions but must choose between the alternatives presented. That is our plight here. No situation is ideal based upon disrupted family relationship.

We do not take at face value the testimony that places the worst possible construction upon defendant's association with other workers in the Tennessee aircraft plant. The evidence falls considerably short of overcoming the strong presumption in favor of Sandra's legitimacy. As to the strength of such presumption, see Craven v. Selway, 216 Iowa 505, 508, 246 N. W. 821, and cases therein cited. The showing of nonaccess is not such as to make it unlikely that plaintiff is her father. We have recently said that neither the mean nor the extremes of the period of gestation is so commonly known as to permit judicial notice. Spears v. Veasley, 239 Iowa 1185, 34 N. W. 2d 185.

Even assuming the truth of the charges against defendant, there is some significance in the fact that plaintiff (with all the knowledge he now has) lived with her approximately eighteen months after Sandra's birth, apparently willing to leave her in charge of Judith in spite of the things he now claims render her unfit for that trust.

Nor did his niece, who testified to admissions by defendant, seem too shocked by the alleged revelations, since she invited defendant to her wedding shower after the separation between plaintiff and defendant had occurred.

The record shows nothing derogatory to plaintiff's moral character but there are indications in his own testimony and otherwise of a lack of feeling and sympathy. He says that after defendant and Judith came to Iowa "I said nothing to her about returning the child, because I had other plans." In November or December after they left "I sent the little child's clothes to the little child and my wife's clothes to my wife. I paid the express or carrying charges on the little child's clothes. I did send some of my wife's clothes by express * * * C.O.D. Under

the circumstances I have not supported this child [meaning Judith] * * *. I was not unable to support it, because I could have. * * * I did not know for sure whether she [defendant] would spend it on the other child and not on my girl. * * * I couldn't trust her. I preferred not to send any money for the child's support." There is here no indication of any gentleness of character or understanding of human nature necessary to qualify one for the task of rearing a child.

These various considerations may have influenced the trial court who said:

"Frankly, I am not satisfied in my mind that changing the present custody of the child would be to the best interest of the child. As is the case in most cases of this sort, the evidence isn't all one sided * * * this is a child of tender years * * * [plaintiff] states, himself, that the defendant has always cared for the child well— * * * and the other evidence indicates that the child is receiving good care * * * has normal affection for its mother; and the evidence isn't clear and convincing that the defendant is morally unfit to raise the child—there is evidence that she is, but the court isn't convinced that she is not a proper custodian of the child."

There is, of course, much more in the record but we have set out enough to indicate its trend. It does not reveal (at least not clearly) what arrangement plaintiff has made or could make for the child's care. We have little insight into the attitude of his parents. He testifies his mother is willing to help him take care of the child but neither she nor plaintiff's father testified or appeared in court.

On the other hand defendant's parents both testified and the court had opportunity to see and hear them. They are fond of the children and willing to continue to provide a home for them and for defendant.

A careful study of the record leads us to the same conclusion reached by the trial court. More need not be said. The decree is accordingly affirmed.—Affirmed.

All JUSTICES concur except MANTZ, J., not sitting.