BETTY BLUNDI, appellee, v. ANTHONY BLUNDI, appellant.

No. 48047.

(Reported in 55 N.W.2d 239)

OCTOBER 14, 1952.

Owen Cunningham, of Des Moines, for appellant.

Charles W. Bowers, of Des Moines, for appellee.

GARFIELD, J.—This is another of the many regrettable controversies that come before us over the custody of a child.

Plaintiff, whose maiden name was Betty Burns, married defendant, Anthony Blundi, March 6, 1943, when she was seventeen. The only issue of the marriage, Dennis, was born October 22, 1943. Plaintiff was granted a divorce on December 10, 1945, on the ground defendant was guilty of such inhuman treatment as to endanger plaintiff's life. The decree awarded her custody of the boy, then two, and $20 per month child support from defendant who was given the right of visitation. Incidentally, the decree bears defendant's approval as to form.

On March 22, 1951, defendant filed petition for modification of the decree asking for custody of the boy, alleging plaintiff had not provided Dennis a suitable home or proper environment and as a result he was ill and disturbed emotionally. This petition was heard April 16, 1951, by the same judge who heard the original divorce suit. Relief was denied and defendant has appealed. Since the appeal presents largely fact questions we will briefly summarize the evidence.

Defendant was discharged from the Army four days after the divorce was granted. Plaintiff and the boy were then living with the former's parents in West Des Moines where Dennis had lived since birth. Defendant testifies that at the time of the divorce he suggested if Betty was to get custody of the child

she stay with her parents. Plaintiff's mother, Mrs. Burns, says and it is not denied that when Dennis was born defendant told her his mother was not able to care for the baby. In any event it seems clear defendant consented to the boy's staying in the Burns home.

Plaintiff's parents owned their home in West Des Moines free of incumbrance. It consisted of seven rooms and was comfortable. They lived there thirty-seven years and reared eight children of their own. Mr. Burns was a railroad conductor. In September 1947, his work was such that he, his wife and Dennis moved to a modern apartment in Rock Island where they lived until January 1950. However, the family had a pass on the railroad and made frequent visits to Des Moines when Betty saw the boy. In January 1950, Mrs. Burns and Dennis went to California where the boy, then six, attended school. They returned to Des Moines in April because of Mr. Burns' serious illness from which he died May 17.

After Mr. Burns' death, Mrs. Burns and the boy lived in the home of a daughter in Des Moines until September 1950 (except for the boy's visit in Philadelphia which we will later mention), when Mrs. Burns purchased a small restaurant on Dean Avenue in a residential district in East Des Moines. Dennis was then in Philadelphia but Mrs. Burns and Betty moved to living quarters adjoining the restaurant which Mrs. Burns operated. Dennis lived there with his mother and Grandmother Burns after his return from Philadelphia until the petition for modification was heard in April 1951.

In the meantime, on May 11, 1946, Betty made another unfortunate venture in matrimony by marrying one May. Two children were born of this union. May was also cruel to plaintiff and she divorced him in April 1950. Since this divorce plaintiff, who is without means, was unable to provide for the two May children and they have lived most of the time with a married sister of plaintiff in West Des Moines. May, who was ordered to contribute $20 per week for support of his children, "pays when he feels like it, which isn't very often," according to plaintiff.

Upon his discharge from the Army four days after the divorce defendant returned to his parents' home in Philadelphia.

He attended college part of one semester and then in 1946 took a job he still holds in Washington, D. C. His starting pay was $2390 annually which was gradually increased to $4075 at the time of trial. Defendant leaves his parents' home in his car for Washington on Sunday afternoons and returns Friday evenings or Saturday forenoons. He maintains a room in Washington. He is an only child. His father is a plumber. If defendant were granted the relief asked, care of Dennis would fall mainly to defendant's mother and he would live with defendant's parents. Defendant would ordinarily see Dennis only about a day and a half each week end.

Defendant's parents have a "row" house, with no space between adjoining houses. Its entrance directly abuts a paved, one-way street where children play although they are doubtless in danger from careless motorists. Dennis would have a room of his own there. Proximity of the Blundi home to school and church does not appear. It is not shown there are other children in the neighborhood with whom the boy could or should play if there were room for play. The burden of proof of course rested upon defendant. Jensen v. Jensen, 237 Iowa 1323, 1324, 25 N.W.2d 316, 317, and citations; Nichols v. Nichols, 239 Iowa 1173, 1177, 34 N.W.2d 187, 189; Beyerink v. Beyerink, 240 Iowa 45, 49, 35 N.W.2d 458, 460.

Defendant kept up his monthly payments of $20 for child support until Dennis started to school. He then voluntarily increased them to $25 which he admits is meager and inadequate. Before the trial defendant had seen his only child three times, once when he was a few months old, next about December 4, 1945, just before the divorce, and finally on July 2, 1950, when he came to Des Moines to take Dennis to Philadelphia for a visit. Except during this visit defendant's parents had never seen the boy. During the four years and seven months between December 4, 1945, and July 2, 1950, defendant had annual vacations of twenty-six days from his work in Washington.

Relations between plaintiff and defendant and between the Burns and Blundi families continued quite friendly following the divorce. There were attempts at a reconciliation. Defendant was frequently told of the boy's progress. It seems to be conceded Dennis was taught to respect his father.

The boy's visit to Philadelphia is a matter of importance. It created in him a haunting fear he would be compelled to live there and it also throws a revealing light upon the make-up of defendant and his mother. When defendant came to Des Moines on July 2, 1950, ostensibly to take Dennis to visit at his parents' home, Betty and her mother hesitated to let defendant take the boy because they feared he might keep him. As defendant admits, "It turned out her fears were well grounded." Only upon defendant's assurance he would return the boy in time for school was consent to the visit given. Defendant not only repudiated his agreement, if he ever intended to keep it, but put Betty and her mother to great trouble and the mother to much expense in getting Dennis. This all appears from the testimony of defendant himself and his mother.

Defendant says: "I told them I would bring him back in time for school. He was to stay with me from July to August. * * * In September Betty came to get the child after he had been in school two or three weeks. She had asked me to bring him back. I told her I did not intend to bring him back, I intended to keep him. * * * I took the boy and my mother to Washington, D. C. to get him away from Betty. I came home during the week to get the child secretly. I told Betty I was going to take him out of the state, I didn't know where. I told her she could not take him back to Des Moines. * * * When he came to Philadelphia I immediately undertook to raise him in my faith." (Defendant is a Catholic. Plaintiff and her mother are Lutherans.)

Defendant's mother testifies: "The boy was at my home when Betty came to get him. I refused to turn him over to her. My son told me not to until he came from Washington. * * * I knew when my son brought him to Philadelphia he agreed to return him to Des Moines. * * * That night my son took both of us to Washington. We did not tell Betty anything about it. * * * I was trying to hide him from Betty."

Betty says, and it is not disputed, that when she went to Philadelphia to get her boy whose custody the court had awarded her, "They told me I could be picked up for kidnaping."

It was not until Betty made a second trip to Philadelphia

from Des Moines that she succeeded in getting Dennis. These two trips made necessary by defendant's repudiation of his agreement, with the aid of Mrs. Blundi, cost Mrs. Burns about $700 which she could ill afford to pay. This conduct of defendant and his mother greatly upset Dennis and created in him a terrible fear he might be compelled to live in Philadelphia. Defendant admits Dennis was glad to see his mother when she came to Philadelphia for him and wanted to return to Des Moines with her. When the boy was finally returned to Des Moines about October 1 he was hysterical with joy and told his grandmother, "I am never, never going back to Philadelphia. They wouldn't let me come back and see my mama and you."

There is much undisputed testimony that after his return from Philadelphia Dennis was afraid to sleep alone for fear he would again be taken there. He also had difficulty in becoming adjusted to school in Des Moines. His teacher and a registered nurse both attribute this largely to his experience in Philadelphia. Defendant himself testifies, referring to his attempt to keep the boy in Philadelphia contrary to his agreement, "Dennis was quite upset about the affair. * * * The trouble Betty and I had over getting the child back to Des Moines upset him quite a bit. I know it caused him to be upset later."

Principal witnesses in support of the petition for modification were defendant and his mother. Obviously they had little first-hand knowledge of the conditions under which Dennis had lived although defendant visited the Dean Avenue restaurant and living quarters when he came to Des Moines for the trial. This testimony of defendant on direct examination states his position:

"As a reason for the court to give me custody of the child, I don't think he is living in a very wholesome environment. He is living in an all-night restaurant frequented mainly by railroad men. They are good people but undoubtedly their conversation would not be what it should be. There is a juke box there playing all the time. Dennis does not get to bed early and the place is not comfortable. There is no heat and from what I could see there was no bathtub. The place is located by a railroad and there didn't seem to be many children about. From the past

performance of Betty, I don't think she is interested in the child."

While there is other evidence which should be mentioned we will refer now to some legal propositions. Under our repeated holdings and the authorities generally the divorce decree is final as to the circumstances then existing. It can be modified only if defendant has carried the burden of proving by a preponderance of the evidence that subsequent conditions have so changed that the welfare of the child demands or at least makes expedient such modification.

We have frequently said and the modern authorities agree that in a matter of this kind the welfare of the child is superior to the claim of either parent and the wishes of the parent are entitled to little if any consideration. Nor should the decree be modified to reward or punish either parent.

In support of the above fundamental propositions see Jensen v. Jensen, supra, 237 Iowa 1323, 1324, 1325, 25 N.W.2d 316, 317, and citations; Beyerink v. Beyerink, supra, 240 Iowa 45, 48, 49, 35 N.W.2d 458, 460. The Jensen case resembles this case on its facts.

With reference to removing the child from the jurisdiction of the court, the Jensen opinion quotes this with approval from 27 C. J. S., Divorce, section 313 (page 1330 of 237 Iowa, page 320 of 25 N.W.2d): "It is against the policy of the law to permit the removal of the child from the jurisdiction unless its welfare would be better subserved thereby, and ordinarily custody should not be awarded to a nonresident * * *." See also Paintin v. Paintin, 241 Iowa 411, 416, 41 N.W.2d 27, 30, 16 A. L. R.2d 659; annotation 15 A. L. R.2d 432, 455.

The Jensen opinion points out the distinction between such a case as this where the father has been deprived of the child's custody by a divorce decree and those like Allender v. Selders, 227 Iowa 1324, 291 N.W. 176, and Risting v. Sparboe, 179 Iowa 1133, 162 N.W. 592, L. R. A. 1917E 318, cited by defendant, where there has been no such prior adjudication. In the former class of cases the presumption is in favor of the reasonableness of the decree sought to be modified. Of course this presumption does not prevail where there has been no such

previous adjudication. See also Maron v. Maron, 238 Iowa 587, 591, 592, 28 N.W.2d 17, 19.

This controversy is triable de novo here. However, weight should be given the findings of the trial court (several of our decisions say they are entitled to much weight) because of his better opportunities to weigh the testimony. Brin v. Brin, 240 Iowa 659, 662, 37 N.W.2d 261, 263; Dow v. Dow, 240 Iowa 145, 151, 35 N.W.2d 853, 857; Maron v. Maron, supra, 238 Iowa 587, 591, 28 N.W.2d 17, 19 ("The trial court was in better position than we are to determine such matters."). See also Joiner v. Knieriem, 243 Iowa 470, 481, 52 N.W.2d 21, 27, 28, and citations.

We think it has not been shown conditions since the divorce decree have so changed that the welfare of the boy demands or makes expedient sending him to live in Philadelphia where his only previous experience was so unfortunate. This is not the extraordinary case where the child's custody should be awarded to one who lives more than one thousand miles beyond the jurisdiction.

Defendant concedes in argument there was no good reason for disturbing the boy's custody while Mr. Burns lived but contends the situation became unbearable after his death. Indeed the principal changed conditions on which defendant relies are those resulting from Mr. Burns' death. We note, however, that defendant testifies on direct examination, "I had made up my mind to do this just before Mr. Burns took sick."

It is true Mr. Burns' death deprived the family of a steady source of income so that defendant might well have increased his payments for support of his only child. But plaintiff and her mother made the best of the situation, worked hard to support themselves and Dennis and it has not been shown he has not been well cared for since his grandfather's death.

As stated, following Mr. Burns' death (May 17, 1950) Mrs. Burns and Dennis lived with a daughter in Des Moines. The boy was in Philadelphia from about July 2 to October 1. Dennis then lived with his mother and grandmother in the rooms adjoining the Dean Avenue cafe until the trial in April 1951. It is true the living quarters adjoining the cafe were not an ideal place

for him although they were not quite so bad as defendant pictures them. They were adequately heated, but were without bath, although equipped with lavatory and stool. (The $700 spent in returning the boy to Des Moines would doubtless have paid for a bathtub.) Dennis had a room of his own while Betty and her mother shared a room.

It appears Mrs. Burns, Betty and the boy were living on Dean Avenue somewhat temporarily until more suitable quarters could be obtained. It is not unlikely they are better housed before now. Mrs. Burns testifies, "I don't expect these quarters to be permanent. I hope to have a home together. I am trying to get the restaurant organized so I can make different arrangements later."

While living on Dean Avenue the boy had a large back yard and a front yard for play—it was not necessary to play in the street—and school was only six blocks away. He was taken to school in Mrs. Burns' car. Defendant's parents have no automobile and defendant keeps his car in Washington except on week ends. A near neighbor, disinterested so far as appears, says, "There are quite a few other children in the neighborhood. It is a pretty good neighborhood. * * * The restaurant and Mrs. Burns' living quarters are clean. It is a nice cozy little home. They are good housekeepers. * * * There is no rowdyism." There is other similar testimony and it is virtually without dispute.

The testimony is most persuasive that Dennis has thrived under the devoted care of his mother and grandmother. The neighbor above referred to testifies, "I see Dennis every day. * * * he is a well-behaved little boy. Always clean when he goes to school and returns * * *. He is a smart boy. He minds both his mother and grandmother. * * * He has friends. When he gets home he goes out back to fly his kite, ride his bicycle. He is always drawing, writing, spelling, studying. There are other children in the neighborhood, two just east, about the same age and they play together. I would say it is a good environment around the home. He seems contented." If Dennis were sent to Philadelphia there would be little opportunity for him to fly his kite or ride his bicycle there.

The registered nurse says, "I have observed the growth and

development of the boy. He is extremely intelligent, has great possibilities. I think a great deal of this is due to past training. * * * I think his development has been more normal than most children from a broken home and I have seen nothing out of the way in it. He has always been raised in a good home with proper moral surroundings, in a neighborhood where there were good, respectable people and a proper environment. * * * He appears to be happy and contented. Goes to school regularly. I think he enjoys it. He is exceptionally well dressed, always neat and clean. He is an obedient boy."

A sister-in-law of plaintiff testifies: "Dennis seems normal and healthy in every respect. He is a pretty good, well-behaved boy. I don't know of any bad habits. To my knowledge he has never been in any difficulties. * * * The boy seems happy there [on Dean Avenue]. * * * He is sent to school regularly. He is well clothed. He seems to have the things of other children of the same walk of life."

Mrs. Burns says, "There are seven children for him to play with. He plays all the time with them. They get along fine. I get along fine with him in the home. There are no disciplinary problems. His mother gets along with him fine. He has a nice disposition but has some tantrums sometimes. He is just a normal boy. He enjoys games with other boys. Likes to read, draw, color. Is very good at it. I encourage him in his schoolwork and try to develop special talents. He goes to the Lutheran church in West Des Moines and seems to enjoy it. * * * Dr. Sternagle told me he was in perfect health, he had always been a healthy boy. * * * I have seen to it that he keeps proper hours. School nights he goes to bed about nine. Saturday nights not so early. Some of us read to him. He reads to us. I have always encouraged him to respect his father."

There is other evidence to like effect and it is all practically undisputed. Indeed defendant's mother testifies that when Dennis came to Philadelphia "he seemed very nice." Defendant says, "The boy has exceptional ability, seems bright and has talents along mechanical lines. He has had proper encouragement in the home to learn." It is shown without dispute that the day defendant took the boy to Philadelphia he told Mrs.

Burns "he was pleased with the way Dennis was being raised." Defendant testifies, "I have never made any complaint until now about the way Mrs. Burns has raised the child. Never told anyone she is not providing a good home or giving him proper care." Of course plaintiff cannot be expected to provide a pretentious home for the boy with the meager $25 monthly contributions she receives from defendant.

It is doubtless true plaintiff has not been without fault and her life has left much to be desired. However, we cannot agree she does not have great love for her first-born, thinks it would be best for him to live in Philadelphia with defendant's parents or is willing for him to go there, as defendant seems to contend. The proprietor of an apartment in Des Moines where Betty lived for a time after her separation from May testifies as a witness for defendant: "Plaintiff was not too happy; mentioned her children several times. * * * She was worried about them, seemed to have a great deal of love for them." It is persuasive evidence of plaintiff's unwillingness Dennis be kept in Philadelphia that she made two trips there from Des Moines to get him and would not be deterred from her purpose by the combined efforts of defendant and his mother.

In any event it clearly appears the boy has strong affection for his mother and Grandmother Burns and, understandably, wants to stay with them. The registered nurse says, "He seems to have a deep affection for his grandmother and his mother." And the great devotion of Mrs. Burns for Dennis is not open to doubt. As she says, he is like her own child. Nor is there any question as to Mrs. Burns' good character or the success she has had in helping to rear the boy from birth.

We are not persuaded it would promote the boy's welfare to tear him from the home he has always had where he has done so well, from the loved ones who have nurtured him since birth until now that he is nearly nine, from his friends and playmates, the school and church he has attended, and send him against his will out of the jurisdiction into the Philadelphia home of his father's parents where his only previous experience inspired in him such fear, contrary to the judgment of the experienced trial court who had litigants and witnesses before him. At best it

would be a dubious experiment which should not be made.

Jensen v. Jensen, supra, 237 Iowa 1323, 1332, 25 N.W.2d 316, 321, Wiggins v. Wiggins, 239 Iowa 1279, 1297, 34 N.W.2d 607, 616, and Scheffers v. Scheffers, 242 Iowa 563, 570, 47 N.W.2d 157, 161, all quote this with approval: " 'When a child is legally placed in a home where it receives good treatment and moral training, it should never be removed from that home, except for the most cogent reasons.' " Such reasons have not been shown here.

Scheffers v. Scheffers, supra, also states: "We feel it would be fundamentally wrong to take this child from the home to which it has become so attached and to award his custody to defendant * * *. * * * Defendant made practically no effort to obtain the child's custody for nearly three and one-half years after the separation. That period has now increased to more than four years."

See also Herr v. Lazor, 238 Iowa 518, 526, 28 N.W.2d 11, 15, 16; Jensen v. Sorenson, 211 Iowa 354, 364, 233 N.W. 717; Knochemus v. King, 193 Iowa 1282, 1285, 188 N.W. 957, 959; Elliott-Mault v. Elliott, 329 Mich. 544, 552, 46 N.W.2d 373, 377, 378, cited with approval in Scheffers v. Scheffers, supra. The Elliott case says, "This court has repeatedly recognized * * * that a change in the environment of a young child is ordinarily not conducive to the child's welfare. * * * His custody should not be made a matter of experimentation."

Our repeated holdings that a mother, save in exceptional circumstances, is best fitted to care for a child of tender years also may have some application here. See Bell v. Bell, 240 Iowa 934, 939, 38 N.W.2d 658, 660, and citations; Voy v. Voy, 241 Iowa 673, 676, 41 N.W.2d 869, 870, and citations. Bell v. Bell (at page 938 of 240 Iowa, page 660 of 38 N.W.2d) also points out that where one parent seeks to take custody of a child from the other with whom the child has been residing, "the one seeking to take actual custody from the other has the burden of showing some superior claim based on his ability to minister, not *equally*, but *more*, effectively to the child's well-being."

Except for small payments for child support defendant has taken a virtual vacation from fatherhood that has lasted now

nearly nine years. With defendant's consent the boy has been faithfully cared for since birth by plaintiff and, especially, by her mother until strong bonds of mutual affection have formed between them. Defendant belatedly seeks to terminate the arrangement that has proven so satisfactory for the boy and to become a father mainly on week ends. We are content not to disturb the trial court's decree.—Affirmed.

MULRONEY, C. J., and BLISS, OLIVER, WENNERSTRUM, and THOMPSON, JJ., concur.

MANTZ, J., dissents.

MANTZ, J. (dissenting)—I am unable to agree with the majority opinion, and respectfully dissent.

It depends upon the fact situation. The welfare of the minor is one of the elements to be considered but as I view the cases it is not absolutely controlling. Precedents and statements of opinion by writers furnish little aid in situations like this. Suitability, character and conduct of the parties directly involved are not to be lost sight of. It goes without saying that an award of custody suitable and proper at the time may later show such a radical change that the prior award should be changed. That is what I assert the record shows in this case. Much could and did happen in the more than five-year period between the divorce and defendant's application for a modification of the decree. When the divorce was granted on December 10, 1945, the son, Dennis, was a little over two years old. After the marriage on March 6, 1943, plaintiff and the defendant lived in the house of her parents in West Des Moines, a comfortable modern home. True, defendant was not there much of the married life due to his being in military service. During that time he was transferred to the eastern part of the country and while there plaintiff and her mother visited him and for some weeks visited his parental home in Philadelphia. Thus, both knew of the home of defendant's parents and their situation, which the plaintiff argues was not suitable for Dennis. The majority opinion seems to infer that. There is not in the record any credible evidence that the home where Blundi lived with his parents was not a fit, suitable or proper place.

The record shows that in 1944 plaintiff started a divorce proceeding but did not press it. The grounds claimed are not shown but from her conduct it is not difficult to infer that she had in prospect another matrimonial alliance. When the second action was instituted, defendant, like thousands of others in the military service, was in a position where he could do little to defend himself. He came to Des Moines—saw his wife and son, and the situation with the wife living in the comfortable home of Mr. and Mrs. Burns. With plaintiff apparently intent upon another husband in the offing it is not difficult to understand defendant's appraisal of the setup and his decision to let her secure a divorce with the understanding that she was to remain in the Burns home with an award of custody to her. The record of the divorce proceeding is such that it seems to be in line with the old adage "ask and ye shall receive." While the divorce decree was a finality, I question seriously whether the showing, even if uncontested, was sufficient to meet the requirements of the statute. But what happened later is pertinent to the custodial claim.

The record shows actions and conduct of plaintiff from the time of the divorce until the filing of the application for modification. Her attitude toward her son, her conduct during that period, abundantly show a steady and persistent disregard of her legal obligation to care for her son. Absences, indifference to his welfare, casting all of the responsibility upon her father and mother, and she herself indulging in a course of conduct which on May 11, 1946 culminated in what the majority opinion charitably characterizes as "another unfortunate venture in matrimony by marrying one May." The term "unfortunate" is rather misleading in the face of the record. This was about eight months after her divorce from defendant. A little over seven months thereafter she gave birth to another son. Later another son was born to her and on April 17, 1950, she divorced May, being awarded custody of the two children. Later these were placed with other relatives while plaintiff moved from place to place, working occasionally but giving scant attention to Dennis. During most of this time she was seeking reconciliation with defendant. There is abundant evidence in the record

that she sought to resume marital relations with him. She admits it and the record abundantly confirms it.

Mr. Burns, father of plaintiff, was a railroad conductor on the Rock Island. About two years after the divorce from the defendant, Mr. and Mrs. Burns and Dennis moved to Rock Island and lived there about three years. They made occasional visits to Des Moines and at times plaintiff saw her son. In 1949 Mrs. Burns and Dennis went to California and remained there for a few months. While there Dennis attended school. Due to the illness of Mr. Burns they returned to Des Moines. Mr. Burns died in May 1950. Later the home in West Des Moines was sold and Mrs. Burns and Dennis resided in various places in Des Moines, but never for long intervals. Mrs. Burns regularly corresponded with defendant about Dennis. Some letters also went to the parents of defendant. All the time the feelings between the Burnses and defendant and his parents were friendly and cordial. The Burnses fully realized the feeling of defendant for his son. Both plaintiff and her mother had visited the Blundi home and well knew the surroundings.

It can hardly be questioned that as between Mrs. Burns and Dennis there grew a strong attachment. Plaintiff fully recognized this when in her limited dealings with Dennis she said, speaking of her mother and Dennis, "What she says goes"; also, "She has the last word." The record fairly shows that as between Dennis and Mrs. Burns the boy had a rather free rein.

When defendant sought to exercise his right of visitation he asked that Dennis be sent by plane to Philadelphia—it was Mrs. Burns who objected and she insisted that defendant come and get Dennis. This was done and the boy was taken there and was placed in a parochial school. When he arrived there naturally it was strange and it would require some time for him to adjust himself to the Blundi home. There is in the record statements that when Dennis came to the Blundi home he was not in good health; that he did not care for certain foods; that he was nervous. The defendant, the record shows, became and acted the part of a real father in spite of the fact that his weekly duties took him away part of the time. It might be said in connection with the schooling of Dennis that defendant wanted

the boy placed in a parochial school, as had been agreed upon before he was born, and he offered to pay the extra expenses. This request did not meet with the approval of Mrs. Burns. The excuse offered was that the parochial school in Des Moines was too far away.

The record shows that there were communications between defendant and plaintiff and Mrs. Burns as to other visits between defendant and his son. The Burnses suggested that as they had railroad passes it would be cheaper for them to bring Dennis to Philadelphia. The majority opinion seems to lay considerable stress on the fact that defendant did not visit his son more frequently. The record abundantly shows the reason for such situation.

Defendant testified that such meetings were not had due to inability to agree on dates. The record shows that defendant regularly wrote to his son and sent gifts and presents, and there is no evidence that he ever sought to shirk his responsibility as a father. While the majority opinion refers to the payments made as inadequate, there is nothing in the record to indicate that either Mrs. Burns or plaintiff made any move or request to have the payments increased.

The majority opinion seems to think the trip of Dennis to Philadelphia was important and "created in him a haunting fear he would be compelled to live there * * *." It strikes me that such "haunting fear" was premature and without merit. All understood that he was there for a visit and all agreed to that. I think the record, fairly construed, indicates that plaintiff, custodian under the divorce decree, was willing to permit Dennis to remain with his father. The defendant testified that during this period in communications between them this was agreeable to plaintiff. I think it can be fairly inferred from the record that when Mrs. Burns learned Dennis was in a parochial school, she—not plaintiff—demanded his return. Plaintiff was willing to have Dennis live with his father in the Blundi home, *providing she too could again resume marital relations with the defendant.* She does not deny his claim in that respect—again it is back to Mrs. Burns, "What she says goes."

In the face of this it can readily be seen that defendant

desired to keep his son, and when I examine the record fairly and impartially I can understand his actions there. Had defendant desired he could have gone into court and restrained the return of his son to Des Moines. At that time he was unaware of the local situation in Des Moines where Dennis was taken into admittedly unwholesome surroundings, and the alibi blandly offered was "it was just temporary." The place was not modern—the rooms small—lacking sanitary conditions, and Dennis was in and out with cafe patrons while his mother was there working for what amounted to room, board and spending money. Her other two children had been hawked about from relative to relative.

In the summer of 1950 defendant took Dennis back to his home in Philadelphia. This was by mutual consent. He stayed with defendant until September. Defendant did not remarry but lived with his parents in Philadelphia, he being their only child. They own their home which is large and modern. Both Mrs. Burns and plaintiff had been there at intervals prior to the divorce. When he got Dennis the latter was living with Mrs. Burns in the upstairs of a frame house in West Des Moines. Plaintiff did not live there at the time. Letters between plaintiff and defendant about the stay of Dennis in Philadelphia passed between them. Defendant wanted him to stay. It seems that plaintiff was attempting a reconciliation. A picture of Dennis had been sent to defendant. Plaintiff wrote defendant telling about Dennis. He testified: *"During this time I wrote her a letter and asked her to come back to me and she agreed to do this. Shortly after this letter I received a telegram from her saying that she was going to have a baby."* (The telegram was Exhibit E and was certified to this court.) Defendant further testified: "The last time I had seen my wife was shortly before the divorce, about December 4th. After I received the telegram I phoned my wife and asked her what it meant. She said, 'Yes, I am going to have a baby.' She said I was not its father and named some man as its father. She also stated she was not going to marry the father of the child." I wonder how many fathers could remain silent with a son living in such an atmosphere and in custody of one whose moral shortcomings

were so glaring. To my mind no delayed or belated claim of affection would excuse or palliate such conduct. Possibly it was "unfortunate"—unfortunate for Dennis.

Defendant testified that he wanted the boy to come to his home and that he had ample means to provide proper care for him; that his mother and father love the boy and he likes them; that if given the child he will educate him and attend to his religious training; that his parents have a large comfortable home and Dennis would have a bedroom of his own.

Plaintiff as a witness in her own behalf made various statements which seem rather illuminating and revealing. In them she said:

"I would not have married Blundi if I thought I was going to get a divorce. I hope some day to have a home for all three of my children. I expect to get married again. I have no one in mind. If I get married again, it is my thought to take the boy with me. That was my thought when I married Mr. May. I made a mistake when I married May, but not when I married Blundi. I made a mistake when I got a divorce from Blundi. He is a pretty nice fellow. He would make a good father for one of my boys, but I have three. Where Dennis goes, I go. Dennis should be back with his father, but not without me. I don't expect Blundi to take me back. I think I could make Blundi happy. I don't think he could forget all that has happened in the past. I don't think he should. I don't think I should go on paying the rest of my life for the mistake I made. *I don't think Blundi should be deprived of the comfort and companionship and the right to look after his boy from anything he has done. He has tried to do the right thing by me and the boy. I think that if he had custody of the boy he would do all in his power to make him a good father and a good home.* I would too. He has better opportunity and better facilities, but I will have some day too. * * * Mother can't be father, mother, grandmother and grandfather to the boy, but she can be the grandmother and I will be the mother. My husband has a right to have concern over the custody, welfare and future of the boy. * * * He would be a poor man if he did not. *I know it is for the best interests of the boy,* but I am still his mother." (Italics for emphasis.)

I have gone over the record carefully—parts of it have been set out above. In a case like this precedents are of little help. The case here is triable de novo. Freese v. Freese, 237 Iowa 451, 22 N.W.2d 242; Jensen v. Jensen, 237 Iowa 1323, 25 N.W.2d 316. The ultimate question is: Has the defendant shown such change of circumstances since the original decree to warrant the court in changing the custody of the child, and, if so, would it be for the best welfare of the child? Naturally many considerations are involved: the condition of plaintiff and defendant when married and divorced and the situation which existed until the present application was brought. When the child was born and for some years thereafter the defendant was in the military service and his inability to visit his wife and child can be well understood. Evidently plaintiff contemplated a divorce and started a proceeding to obtain one some time before the present action. Being in the service when the present action was started the defendant was not able to do much in his own defense. Doubtless he did what hundreds of others did under the stress of circumstances beyond his control, permitting plaintiff to secure a decree of divorce and an award of custody, hoping, no doubt, that after the expiration of his military service a reconciliation might be effected and a home secured. As a matter of fact the record shows that in correspondence, letter and phone both plaintiff and defendant had that in mind. Nor can it be said that defendant failed to send regularly and without interruption the money agreed upon for the child's support—in fact he later, so far as the record shows, without demand increased such payments. He showed the utmost interest in his child by writing frequently, making gifts and inquiries as to its wellbeing. In 1950, with the consent and approval of plaintiff, he came to Des Moines and by plane took his son to his Philadelphia home and the record shows that he devoted himself to his son's interest. The plaintiff in argument lays stress upon the situation which arose when a request was made for the return of the child to Des Moines. She argues that the actions of the defendant in that matter were in violation of the divorce decree. An examination of the record hardly bears out such claim. The decree gave the father the right of visitation. Plaintiff does not dispute

that after the defendant's request to have the son visit the home in Philadelphia she agreed to it.

About that time defendant learned of the situation then existing at the cafe where Dennis was living with Mrs. Burns and plaintiff. At that time I think it can be fairly inferred that plaintiff was willing for Dennis to go to his father and stay with him, but that Mrs. Burns, after letters on that subject had passed between her and defendant, insisted that Dennis return to Des Moines. Defendant knew the legal custody of Dennis was awarded, not to Mrs. Burns, but to plaintiff, and naturally he placed some reliance upon assurances of plaintiff that Dennis could go to his home. It seems that in respect to the custody of Dennis the plaintiff's statement "What she says goes", as to her mother, sums up the situation. Plaintiff realized that Dennis would be better off with the father. She so stated, but at times coupled it with the further statement "He needs his father—he would be best off with him to properly care for him and his rearing—but he needs me also, where he goes, I will go." It is not difficult to gather from the record that she hoped for a reconciliation and a resumption of the marital relation. As I read the record I find difficulty in concluding that defendant acted illegally in neglecting to return Dennis to Des Moines.

Aside from this instance and the infrequencies of visits to see his son in Des Moines, I find nothing in the record which can be the subject of just criticism of his conduct.

Our court in many instances has held that in the matter of custody asked to be changed the primary consideration is the "welfare", not of the parents, but of the child. The word, according to Webster's International Dictionary, means state of "doing well or well-being." In Starr v. Gorman, 136 N. J. Eq. 105, 40 A.2d 564, that court held that the welfare of a child which is controlling in custody cases is gauged by the father's means and station in life and does not contemplate that the child is taken from the father because another can give the child more in a material way. See also Kiles v. Gann, 89 Cal. App.2d 445, 200 P.2d 886; In re Estate of Buell, 198 Misc. 358, 66 N. Y. S.2d 180; Evans v. Lane, 8 Ga. App. 826, 70 S.E. 603; Wiseman v. Tanner, 221 F. 694. In re Bourquin, 88 Mont. 118, 290 P. 250, the court

said that the parents need only be honest and respectable with disposition and capacity to maintain and educate the child.

The term "welfare" as applied to a case like this is broad and comprehensive and embraces a number of vital elements: the age of the child, its health, its associations; the home surroundings, whether temporary or permanent; the spiritual and educational environment, the necessary adjustments which must be made in that most formative period of life; its prospects for the future, the stability, comfort and well-being, training and love and affection of the custodian. While there may be other elements which enter into the picture, I feel that the above are important.

Defendant knew of the situation in the Burns family when Dennis was born; he knew that plaintiff contemplated living there in a good and comfortable home; he knew the mother and father of plaintiff and held them in high esteem. The handicap of military service rendered it difficult if not impossible to establish a home for his wife and son. When Mr. Burns died in 1950 the stability of the Burns home disappeared. After his death the home in West Des Moines was sold and Mrs. Burns and Dennis moved to various places in Des Moines and in September she bought a small cafe on Dean Avenue. Following her divorce from May plaintiff stayed at various places in Des Moines and it was not until defendant objected to the place on Dean Avenue that she moved there—worked for board, room and spending money. She stated that she was keeping company with another man and that she intended to remarry and hoped to make a home for her three children. It seems to me that the place on Dean Avenue where Dennis was kept at the time of the hearing was objectionable for a boy of about seven years. While he went to school and had playmates, yet it can hardly be said that the surroundings were favorable. There is some suggestion in the record that the health of Mrs. Burns is not good. Should she pass out of the picture, what of Dennis? Plaintiff stated as a witness that Dennis needed a father's care and attention and defendant was in a position to furnish him a good home under favorable conditions. While the home offered by defendant was that of his father and mother, still we find nothing in the record

that suggests it is an unfit place for the son. Dennis was not a particularly healthy and robust child and he stood· in need of close attention in that respect. Plaintiff worked in the cafe—it was open all night—the sleeping quarters were in the same building. Dennis was around and about and some of his contacts might not be favorable.

There is another matter touching the welfare of Dennis and that goes to his religious training. The majority opinion apparently considers such of little importance. While there are those who would ignore and discount the situation, it is in the record, and I feel it is entitled to consideration. Defendant is of the Catholic faith and so are his parents. Plaintiff.knew this when she entered into the marriage. She says she and defendant discussed the matter and she readily agreed that any children should be reared in the Catholic faith. Plaintiff and her parents belonged to the Lutheran Church. Plaintiff testified that she "took the deal" religiously and carrying it out had Dennis baptized as a Catholic. Defendant asked that Dennis· be sent to a parochial school and offered to take care of any added expense. The record shows that Mrs. Burns opposed such move. When defendant took Dennis to Philadelphia he placed him in a parochial school. This was not agreeable to Mrs. Burns. It can hardly be said that this is a minor matter so far as defendant is concerned. He impresses me as being a deeply religious type and it is to him a vital matter to have his son reared in a different faith, as long as there was the solemn agreement entered into between him and plaintiff before they were married.

Plaintiff argues it is against the spirit of our law to remove the child to another jurisdiction. I find nothing in the statute forbidding it. The state of Pennsylvania has on its statute books provisions covering this situation and I have no right to assume or presume that they will not heed any legal complaint which might later arise.

I feel that this record, considered fairly and impartially in the light of conditions existing after the divorce and at the time of the hearing, showed that the trial court erred in denying the defendant's application. The fact that the boy, immature and unsettled, preferred his grandmother to his father speaks

little. Mrs. Burns gave him a free rein—something appealing to a growing boy.

The majority opinion seems to stress the love of plaintiff for Dennis. She has strange and weird ways of showing such love. Under the record I feel that she is morally and otherwise unfit for that task.

I hold that the trial court should have awarded the custody of Dennis to his father, Anthony Blundi, defendant herein.

I would reverse.