Gary A. ALEX, Appellant,

Jack W. Alex and Florence Alex,
Intervenors-Appellants,

v.

Bonnie Jean ALEX, Appellee,

Fred Vaughn and Mary Vaughn, Inter-
venors-Appellees.

No. 53105.

Supreme Court of Iowa.

Sept. 17, 1968.

Rehearing Denied Nov. 12, 1968.

Doran, Doran, Doran & Courter, Boone, for appellant and intervenors-appellants.

David E. Green, Carroll, for appellee and intervenors-appellees.

MASON, Justice.

This equitable action involves custody of Jett Alex born October 31, 1962. Jett's natural father, Gary A. Alex, and paternal grandparents appeal from trial court's decree modifying an existing divorce decree governing the child's custody by granting custody to his natural mother, Bonnie Jean Laos, formerly Bonnie Jean Alex.

I. July 27, 1965, Gary A. Alex filed a divorce action against Bonnie Jean Alex. Pursuant to rule 186, Rules of Civil Procedure, issues were separated and plaintiff was granted an uncontested divorce December 16. The contested issue of Jett's custody was tried later. December 22 trial court entered its decree finding neither parent was at the time sufficiently equipped emotionally or materially to be entrusted with the care and custody of this child.

The decree provided for temporary split custody between two sets of grandparents, Jack and Florence Alex, of Coon Rapids, and Fred and Mary Vaughn, maternal grandparents, of Tucson, Arizona.

Paternal grandparents were to have Jett's custody until January 2, 1966, maternal grandparents from that date until May 30 when he was to be returned to paternal grandparents and remain in their custody until the following November 1. Alternation of custody was to continue on a six months' basis until April prior to Jett's registration in school. At that time the matter was to come on for review and any further evidence appropriate for a determination in order that the boy might attend school on a permanent basis with one family or the other, with extensive visitation rights with the other set of grandparents.

September 11, 1967, the paternal grandparents intervened in the divorce action and filed application for hearing fixing Jett's permanent custody in his best interests. October 11 Bonnie Jean Laos, joined by her parents and present husband, Paul Laos, filed application to modify the custody decree. They asserted that since date of the decree there had been a change in the mental and physical condition of Bonnie Jean Laos in that she had married a successful businessman and it would be in the best interests of the minor that he be with his natural mother. In the alternative they requested the child's custody be awarded to Mr. and Mrs. Vaughn.

November 15 hearing was had upon these applications and December 1 the court entered an order granting permanent custody to Bonnie Jean Laos, with visitation rights for a 10 week summer vacation to the paternal grandparents or plaintiff and one week at Christmas in alternate years beginning 1968. Appellants appeal from this order.

II. Appellants assert as propositions relied upon for reversal: (1) The mother has not sustained her burden of proof as to the necessary subsequent change of circumstances concerning the child's welfare involved to permit modification of custody decree, (2) The child's best interests require he remain in the paternal grandparents' permanent custody and (3) It is against state's policy to permit a child's removal from the jurisdiction unless its welfare would be better served thereby, and ordinarily custody should not be awarded to a nonresident or to one contemplating removal from the state.

III. In the modification hearing the court found "clearly there has been a change of circumstances; a split custody arrangement is no longer proper, the parties have both happily remarried. The question is now what the best interests of the child require."

Appellants contend Bonnie Jean Laos failed to sustain her burden as applicant; that appellees' proof does not produce preponderance of evidence necessary to give trial court power to review what is in the best interest of the child involved.

Appellants do not contend there have been no changed circumstances since December 22, 1965, but argue the only change of circumstances the court could find as basis for its decision was the apparently successful remarriage of both parents; it was reversible error for the court to conclude the mother's remarriage was a sufficient change to permit it to consider the question of the child's welfare. They maintain remarriage of one of the parties is not a sufficient change in circumstances to warrant modifying custodial provisions of a divorce decree.

IV. In matters involving child custody provisions of a divorce decree, best interest of the child is first and governing consideration. Authorities need not be cited for this. Rule 344(f)15, Rules of Civil Procedure. Child custody provisions of a divorce decree are final as to circumstances existing at time of entry of original decree. Such provisions will be modified only where applicant for modification proves by a preponderance of evidence that subsequent conditions have so changed that child's welfare requires, or at least makes expedient, such modification. Jensen v. Jensen, 237 Iowa 1323, 1324, 25 N.W.2d 316, 317; Mason v. Zolnosky, 251 Iowa 983, 989, 103 N.W.2d 752, 755; Welch v.

Welch, 256 Iowa 1020, 1024, 129 N.W.2d 642, 644; Herron v. Herron, 258 Iowa 1052, 1053–1054, 141 N.W.2d 562, 563; Pucci v. Pucci, 259 Iowa 427, 432–433, 143 N.W.2d 353, 357; and Maikos v. Maikos, 260 Iowa 382, 147 N.W.2d 879, 881, and citations in these opinions.

■ "'[E]xisting circumstances' are those known or which with reasonable diligence should have been known to the parties and to the court at the time of the entry of the original decree; that is to say, those which are within the contemplation of the litigants and the court when the decree was entered." Simpkins v. Simpkins, 256 Iowa 989, 991, 129 N.W.2d 723, 724.

■ Of course, not every change of circumstances is sufficient basis for modification of a divorce decree. Welch v. Welch, supra; Simpkins v. Simpkins, 258 Iowa 87, 90, 137 N.W.2d 621, 623; Pucci v. Pucci, supra, 259 Iowa at 433, 143 N.W.2d at 357; and Maikos v. Maikos, supra.

■ Changed circumstances relied upon to obtain modification of child custody provisions of a divorce decree must be such as were not within the knowledge or contemplation of the court when decree was entered and must be "more or less" permanent or continuous, not merely transitory, variable or temporary, and where a change of financial condition of one or both of the parties is relied upon as a basis for modification it must be substantial. Simpkins v. Simpkins, supra, 258 Iowa at 90, 137 N.W.2d at 623; Pucci v. Pucci, supra, 259 Iowa at 433, 143 N.W.2d at 357.

V. Although at the first custody hearing the court found Bonnie was not then sufficiently equipped emotionally or materially to be entrusted with Jett's care and custody, the temporary split custody arrangement was never intended as a permanent determination for the best interest and welfare of the child. The original custody decree provided the best temporary arrangement the court could make under the circumstances existing at the time. It made plain that when Jett reached school age a final determination as may appear to be in the child's best interest would have to be made.

A showing of changed circumstances became a requisite only when the court came to consider whether Jett's permanent custody should be awarded to the natural mother rather than one or the other set of grandparents as contemplated in the first decree.

It is not the mother's remarriage that is made the basis of the court's decree changing Jett's custody but rather the results of that remarriage upon the character and stability of Bonnie Jean Laos.

The following portion of the court's decree supports this conclusion:

"The record discloses that defendant was reared in a world and a manner quite foreign to the individual experience of most of us. This does not make it wrong, only somewhat more difficult to evaluate justly. She had whatever advantages there are from great family wealth. Although she appears never to have achieved as a scholar, she did have full advantages of the best of private educational institutions in the United States and Europe. She experienced also what are commonly thought to be the more apparent disadvantages resulting from great family wealth. Her rearing was largely accomplished by hire. At the time of the first submission she demonstrated a depressing amount of emotional immaturity. This was manifested as a want or lack of reality. It was not necessary then, nor is it now, to determine how much of her problem resulted from a privileged past and how much from a disastrous marriage to plaintiff.

"The recognized and considerable improvement in defendant at the time of this submission can be traced in large part to her remarriage. Her present husband very favorably impressed the Court. He holds a responsible position in municipal admin-

istration, is well educated and apparently a good provider. The marriage appears very secure. He is of Spanish-American lineage and expressed and demonstrated a warm and stable family background. Defendant and, indeed, the child himself are partly of Spanish-American lineage, a rich heritage indeed as it is hoped his rural Iowa heritage may also prove to be.

"Defendant has been able to function since her remarriage as a wife, mother and homemaker. She appears to have renounced the habit and practice of having domestic help as a substitute for her own efforts. She demonstrated a considerable growth in maturity.

"Unquestionably defendant has stabilized. She is not yet perfect, nor is she likely to be. She is now fit. It would be a terrible arrogance for this or any Court to demand that she be more."

■ VI. We review the matter de novo. Rule 334, R.C.P.

Bonnie, the oldest of four Vaughn children, attended private schools in London, a boarding school in Switzerland and graduated from a private boarding school, Merrymount High School, at Los Angeles. After graduation from high school she attended the University of Arizona for 2½ years but completed only 23 units giving her a second semester freshman classification before her marriage to Gary Alex.

Gary Alex and Bonnie Jean were married in Las Vegas, Nevada, January 24, 1962, after a courtship of approximately two months. He had been married before, Bonnie had no previous marriages. After marriage they established residence in Coon Rapids, approximately a half block from Gary's parents.

When Jett was born Bonnie did not know how to care for him and Gary's mother took care of him "an awful lot of the time." The family remained in Coon Rapids until July 1965 when Bonnie and Jett returned to Tucson. After Gary lo-

cated her and the child, he went to Arizona, picked up the boy and brought him back to Iowa without telling the mother he was doing so. Later in the month Gary filed the divorce action referred to. October 31, 1965, Bonnie returned to Coon Rapids, stayed 11 days in the grandparents' home. She came back again for the December 16 hearings, waited until the first of the year, then she and Jett went back to Tucson and resided with her parents. Later she enrolled in a Tucson business school which she was attending at the time of her marriage to Mr. Laos.

June 23, 1966, Bonnie married Paul Laos, Jr., 37, in Nogales, Sonora, Mexico. Mr. Laos had been married before and pays $85 per month child support for a son by that marriage who is in the custody of his mother.

As city manager of South Tucson Mr. Laos earns $1200 per month. He is an honorably discharged Korean War veteran and has completed necessary units for a graduate degree from the University of Arizona.

Their home in Tucson consisting of three bedrooms, two full baths, living room, dining room, rumpus room, wash room and kitchen is located four blocks from a parochial school and the same distance from a public school. It is being purchased on contract from Laos Realty Company in which Paul, Jr., has one-fifth interest. It is approximately six blocks from the university and is near a large park with library, swimming pool, swings, baseball diamonds, and football field. Twin boys were born as the issue of this marriage.

Jack W. Alex, 50, is engaged in the sand and gravel and sewer construction business at Coon Rapids. He and his wife, Florence, 49, are respected citizens of Coon Rapids, considered ideal parents and have a good reputation for honesty and integrity. Although not of the same religious faith as Jett, they had made arrangements

with a daughter-in-law for Jett to attend his church regularly while he was in their home. The court found the care and attention Mr. and Mrs. Alex had given the child to be exceptional even for devoted grandparents.

While Jett was in the Alex home he had opportunity to visit and be with his father although responsibility for his care and welfare was fully assumed by the grandparents, a responsibility they had borne up to the time of the first custody decree.

Gary, the oldest of four Alex children, has one child by his third marriage. He did not testify at the modification hearing although his present wife was a witness.

Appellees do not contend Bonnie's remarriage alone was a sufficient change of circumstances to permit the court to modify existing custodial decree but do maintain they have proved by a preponderance of evidence that as a result of this marriage Bonnie "has been able to function * * * as a wife, mother and homemaker. She appears to have renounced her habit and practice of having domestic help as a substitute for her own efforts. She has demonstrated a considerable growth and maturity." They assert this afforded the court a basis for considering the best interest and welfare of the child.

Appellees rely upon the testimony of Fred and Mary Vaughn, Henry Kinnison, Jr., a consulting civil engineer, Rev. Gerald J. Brynda, formerly an assistant pastor at Mr. Laos' church, Isabel Norma Brady, a school teacher for 15 years in Tucson, Janet Alexander, a close neighbor of the Laos family in Tucson, Louis Sotomayor, chief of police of South Tucson, and Jack R. Winn, executive vice president of Union Bank in Tucson, given on depositions taken in Tucson as supporting the trial court's findings.

Summarized, testimony of these witnesses establishes the following changes in circumstances as showing Bonnie's present emotional maturity: (1) She is in good physical and mental condition, (2) is an excellent housekeeper and maintains her home by herself, (3) has no drinking problems, (4) has a natural love and affection for the boy and took complete charge of feeding, clothing and looking after him and is a good mother, (5) was conscientious and good about Jett's mental needs especially during the transition period when she was preparing Jett to return to Iowa and (6) she and her present husband are of the same religious faith as the boy and attend church regularly.

Appellants' contention asserted in their first proposition cannot be sustained.

VII. That there has been a change in the circumstances since December 22, 1965, there can be no doubt. Our problem is whether circumstances then existing have so changed that the child's welfare requires or renders expedient change of custody as made by the court.

■ The applicant—natural mother here —has the burden not only to prove by a preponderance of evidence that subsequent conditions have changed but also to show that a change in custody will be conducive to the welfare of the child. Harwell v. Harwell, 253 Iowa 413, 418, 112 N.W.2d 868, 872.

There was a judicial determination in the first custody decree that neither parent was then sufficiently equipped emotionally or materially to be entrusted with the child's care and custody. The court in the modifying decree said "it was not necessary then, nor is it now, to determine how much of her [Bonnie's] problem resulted from a privileged past and how much from a disasterous marriage to plaintiff." It found Bonnie had stabilized and is now fit. The record supports this finding and there is no evidence to the contrary.

■ However, a divorce decree with respect to child custody should not be modified to reward a parent. Jensen v. Jensen, supra, 237 Iowa at 1325, 25 N.W.2d at

317; Blundi v. Blundi, 243 Iowa 1219, 1225, 55 N.W.2d 239, 242; Thein v. Squires, 250 Iowa 1149, 1157, 97 N.W.2d 156, 162; and Alingh v. Alingh, 259 Iowa 219, 226, 144 N.W.2d 134, 138–139. The welfare of the child is of greatest importance. The temporary split custody arrangement between the grandparents was no longer proper.

In addition to having demonstrated considerable growth in maturity, Bonnie is now sufficiently equipped materially to care for the child. As stated, her present husband earns $1200 per month. They have an excellent home for Jett which has been described as to space and location. There are many children in the neighborhood for Jett to play with. Bonnie and Mr. Laos have no financial problems, appear to have a stable and happy marriage. Her present husband has expressed desire to have Jett in his home. Appellees' witnesses, who were acquaintances of long standing, testified Mr. Laos has a fine reputation in the Tucson community and would be a good stepfather.

The trial court apparently believed the physical facilities offered by the natural mother and paternal grandparents were more than adequate, that the parties were both fit and proper parties to have the child's custody but felt his best interest would be served by placing him with his mother.

This is not a case where the natural mother was taking an extended vacation from the responsibilities of motherhood as in Thein v. Squires, supra, 250 Iowa 1149, 97 N.W.2d 156.

After Bonnie returned to Tucson in July 1965 the child was taken from her and returned to Iowa. She did not abandon him but returned to Iowa October 31, stayed 11 days, made a second trip back to Iowa for the December 16 hearings and remained until after the first of the year when, under the custodial decree, her parents were to have Jett's custody.

Mrs. Vaugh testified the minute Bonnie came to their home in Tucson she started "straightening out" and she observed a wonderful relationship between her daughter and grandson during the first five months Jett was in Tucson. Bonnie assumed responsibility for Jett's care during this period. Since Bonnie married Paul Laos her mother has been to their home probably two or three times a week and they go to the Vaughn home twice a week. When Jett was in Tucson for the November 1, 1966 to May 1, 1967 period, he stayed with Bonnie and Paul who actually cared for and controlled him. Mrs. Vaughn maintained a very close relationship because of her responsibility under the first decree and visited Jett practically every day. He was always well kept, well fed and very happy.

Janet Alexander testified she and Bonnie were in and out of each other's house every day from October 1966 to July 1967. While Jett was in Arizona he and the Alexander child played together. Janet and Bonnie took their children to the park to play once or twice a week, to the zoo, several times on picnics and almost once a week to the story hour at the library. Mrs. Alexander described how Bonnie read to Jett in the evening before and after his bath and how conscientious and good she was about his mental needs.

All of appellees' witnesses except the executive officer of the bank described Bonnie as an excellent housekeeper, a fine cook and a devoted mother performing those functions ordinarily expected of a mother. Their testimony was not based upon isolated incidents.

When Jett was to be returned to Tucson for the second period Bonnie came to Omaha to meet him. Each time he was to be returned to the paternal grandparents under the custodial arrangement Bonnie cooperated fully in preparing him. Undoubtedly this attitude impressed the trial court.

The fact Florence Vaughn, who did not testify in the modification hearing, was more experienced as a mother of four children in taking care of a newborn baby than Bonnie is not surprising. Bonnie cannot be condemned because Jett's paternal grandparents were required to bear the principal responsibility for his care up to the first custody decree. As stated, after their marriage Gary took Bonnie to Coon Rapids to make their home. It was his responsibility to furnish financial assistance for care of his own child, something he evidently did not do before or after their divorce. This fact tends to weaken the basis for appellants' argument that Jett should not be removed from the Alex home except for the most cogent reasons.

Of course, the fact the child has been in the paternal grandparents' home under a stay order from this court does not aid appellants here.

Since commencement of the divorce action in 1965 Bonnie has striven to have her child. There was no long interval where the child was with a third party before she attempted to gain custody as in some of our cases.

If Bonnie had a drinking problem while married to Gary, her witnesses definitely established the fact it has been corrected. Her medical records in Tucson were inspected by appellants' attorney and there is no evidence to the contrary.

The trial court had the benefit of having both Bonnie and Mr. Laos testify in person when determining what was for the child's best interest. Although we are not bound by the findings of the trial court we give them weight. Halstead v. Halstead, 259 Iowa 526, 531, 144 N.W.2d 861, 864.

We agree with the trial court that the appellees have established by a preponderance of the evidence that the best interest of the child makes expedient the modification order.

VIII. Appellants' contention under their remaining assignment is well answered by what we said in Vanden Heuvel v. Vanden Heuvel, 254 Iowa 1391, 1403–1404, 121 N.W.2d 216, 223:

"The question as to whether the mother should be given the custody of this child in view of the fact that she intends to remove him from this state naturally gives us some concern. We have several times approved the statement that it is against the policy of the law to permit the removal of a child from our jurisdiction unless its welfare would be better served thereby. [Citing cases] We may point out, however, that this rule is usually applicable to the situation where divided custody is considered, where one party resides outside the state and, by permitting the child to be taken from the state, a situation may arise where much litigation would be necessary to obtain its return. No such situation is here contemplated."

IX. The modification decree provision granting paternal grandparents or Gary Alex, alternatively and in order, 10 weeks summer visitation of the child should be reduced to a period of one month under the same conditions as prescribed. For a decree modifying such visitation rights this cause is remanded. Thus modified the cause is.

Affirmed.

All Justices concur except SNELL and LeGRAND, JJ., who concur in the result and GARFIELD, C. J., and RAWLINGS, J., who dissent.

GARFIELD, Chief Justice (dissenting).

I must dissent.

In its approach to this case and in reaching the decision now before us it is clear the trial court, doubtless with the best intentions, fell into the error of giving primary consideration to what were thought to be the rights of the opposing litigants to the

child's custody rather than to his best interests. And the majority, with equally good intentions, has fallen into the same error.

Stated somewhat differently, both the trial court and the majority have centered their attention on which of the parties deserves the child, not on what the child—with whose life we are dealing—deserves.

Although it is only incidental, it is deemed proper to observe that if the case is considered from the standpoint which has prevailed with the trial court and the majority here, the decision does a grave injustice to the paternal grandparents with whom the boy has made his home five of the nearly six years he will have lived when procedendo issues from this court.

The principal attempt of the boy's mother, her parents (the Vaughns), their counsel and witnesses who testified for her in depositions taken in Tucson was to show she had acquired sufficient stability, emotionally and materially, to be entrusted with the boy's care. No one questions the emotional and material stability, or the fitness, of the paternal grandparents to have Jett's custody. These propositions stand admitted. Thus appellees at best have proved no more than must be conceded, and the trial court found, as to the Alexes.

Further, under our repeated decisions during the past 24 years the fitness of a parent who has been denied custody of a child by court decree does not establish that the best interests of the child require (as many of our decisions express the thought) or render expedient (as Code section 598.14 provides) an award of custody to such parent.

The decree now on appeal contains this: "It appears the paternal grandparents have fully complied with all prior orders and have carefully adhered to the provisions for them in connection with the split custody." (This may not be said for the mother or her parents.) "They are unusually devoted to the child, having borne the principal responsibility for him up to the time of the prior decree. The Court is most especially and profoundly impressed with the paternal grandfather and finds that the devoted care and attention he and his wife have given the child to be exceptional, even for devoted grandparents."

Terms of the first custody decree (of December 22, 1965) should be clearly understood. It followed by six days the decree granting the boy's father a divorce on the ground the mother had been "guilty of cruel and inhuman treatment toward plaintiff such as to endanger his life."

In the first custody decree the court found neither parent was then sufficiently equipped emotionally or materially to be entrusted with the care and custody of the child; both sets of grandparents would be suitable persons to whom such care could be entrusted and expressed a willingness to assume these responsibilities. (The paternal grandparents had long since assumed and commendably discharged such responsibilities during the nearly three years and two months of the boy's life. The Vaughns were then virtual strangers to him.) The decree went on to recite that neither set of grandparents should be deprived of a chance for association with the child, notwithstanding the great reluctance of courts to split the custody of a child "by reason of emotional turmoil likely to result" and "some reluctance in some of the cases to provide for the removal of a child beyond the jurisdiction of the Court."

The findings in the original custody decree continue: "The best interests of the child, however, would seem to dictate split custody until such time as he commences his formal education. Prior to the commencement of the formal education, a determination will have to be made *in order that he can attend school on a permanent basis with one family or the other, and hopefully with extensive visitation rights with the other set of grandparents.*" (emphasis added)

The decree proper then provides the paternal grandparents should have the boy until January 2, 1966, the maternal grandparents from January 2 to May 30, 1966 (5 months), the paternal grandparents for the next 5 months, and thereafter for alternating six-months periods until the April prior to the boy's registration in school, "when the matter will come on for review and any further evidence that might be appropriate *for a determination as indicated in the Findings hereof.*" (emphasis added)

It seems clear the decree is temporary only in that it delays determination until the April before Jett is ready for school (April, 1967) as to which of the two sets of grandparents is to have his future custody so "he can attend school on a permanent basis with one family or the other." The mother and her parents, their counsel and the trial court all appear to have so construed the decree of December 22, 1965. This placed upon appellees the burden to plead and prove by a preponderance of the evidence circumstances had so changed that the welfare of the boy required or at least made expedient placing his permanent custody with his mother. See Scheffers v. Scheffers, 242 Iowa 563, 568–569, 47 N.W. 2d 157, 160.

The pleaded changed circumstances are that there has been a change in the personality, behavior, and mental and physical condition of Bonnie Laos in that she has married a successful businessman, is now the mother of twin boys and it would be in Jett's best interest for her to have his permanent custody.

In the decree here on appeal the trial court held it was obvious that as between the two sets of grandparents custody would have to be awarded to the Alexes. In considering the mother's claim to custody the court found "Clearly there has been a change of circumstances. *A split custody arrangement is no longer proper,* the parties (evidently the parents) *have both happily married. The question is now what the best interests of the child require.*" (emphasis added)

The court proceeds to hold the mother had improved considerably, traceable in large part to her remarriage; her husband very favorably impressed the court; the mother has stabilized and is now fit; custody should be awarded to her rather than to the paternal grandparents.

Although the same decree provides "a split custody arrangement is no longer proper," it awards split custody just as clearly as does the first custody decree but the time the Alexes are to have the child is reduced from six months to 10 weeks plus addition of a week every other Christmas.

I. We have held many times custody for such a period as 10 weeks by one not having permanent custody amounts to divided custody. A few such decisions are Bennett v. Bennett, 200 Iowa 415, 418, 203 N.W. 26 (two months); York v. York, 246 Iowa 132, 138–140, 67 N.W.2d 28, 32–33 (the mother's taking the child to Ohio, not over half as far from Iowa as Tucson is, for three weeks each summer); Thein v. Squires, 250 Iowa 1149, 1159–1160, 97 N. W.2d 156, 163 (two months with the mother each summer). See also Smith v. Smith, 257 Iowa 584, 588, 133 N.W.2d 677, 679 (summer vacation from school).

These and other precedents point out it is unwise except under the most unusual circumstances, not present here, to divide the custody of a small child. Although no appeal was taken from the original custody decree, it is proper to observe it was unwise at the time it was entered to divide custody between the two sets of grandparents living over 1300 miles apart. Such a decree could not have been rendered if "first and governing consideration" had been given to the best interests of the boy.

"Experience has shown that allowing the child to live a part of the time in one household and a part of the time in another is not only not to the best interest and welfare of the child, but in many instances it is wholly destructive of discipline." Bennett and York cases, supra; Huston v. Huston, 255 Iowa 543, 553, 122 N.W.2d

892, 898–899; Smith v. Smith, supra, 257 Iowa 584–588, 133 N.W.2d 677, 679 and citations. See also McCrery v. McCrery, 258 Iowa 354, 358, 138 N.W.2d 876, 878.

One important reason why divided custody is deemed unwise and not for the child's best interests is shown by this card the mother sent Jett, then only four, when he was with his paternal grandparents in Coon Rapids: "Jett Darling, Mummy is in one of Uncle Paul's offices. I put an X on his building. Do you remember looking out of the windows at the big buildings and playing with all the machines and seeing the parades. When you *come home* mummy will let you play with Uncle Paul and *he will take you to buy many toys and I will have your puppy dog and pony for you.* Lots of kisses, Mummy." (Emphasis added.)

The reference to Uncle Paul was to the mother's second husband. At best it is doubtful that the purchase of many toys and a pony for him furthers the best interests of a four year old boy. Sending the card to him could hardly have done so. So far as shown, acquisition of a pony went no further than mention of it in the card. Nor was the mother's home in Tucson the boy's home, either legally or actually. For her to tell him it was while he was living with his Iowa grandparents would naturally have a disturbing effect upon the child.

Further, it is difficult to reconcile the finding that the best interests of the child required taking him from his paternal grandparents and placing him in his mother's custody with the provision the grandparents should have him 10 weeks each year plus an additional week in alternate years. Appellee Fred Vaughn, maternal grandfather, would have awarded the child to the Alexes for the three summer months each year rather than just 10 weeks. He so testified. "In other words, three months in Iowa, nine months in Arizona."

If it were true the welfare of the child dictates a change of custody to the mother in Tucson it is clear the change should be made without such a provision for divided custody. Thein v. Squires, supra, 250 Iowa 1149, 1159, 97 N.W.2d 156, 163. See also McCrery v. McCrery, supra, 258 Iowa 354, 358, 138 N.W.2d 876, 878. Placing the boy with the Alexes so much of the time is further indication the trial court was favorably impressed with them. McCrery case. Still further indication is this from the decree: "At the time of submission the parties were strongly urged to appeal this ruling. It is earnestly hoped the paternal grandparents do appeal. If they do, the Court does not want to be thought to have made any unwarranted findings against them to bolster this decision."

II. The majority appears to have recognized the force of what has just been pointed out by reducing on its own motion, the period the Alexes are to have the boy from 10 weeks to one month. Under York v. York, supra, 246 Iowa 132, 138–140, 67 N.W.2d 28, 32–33, this amounts to divided custody. In any event it is obvious the majority's decision is more favorable to the mother, who did not appeal, than was the decree the Alexes appealed from.

The majority's action is contrary to the rule repeatedly recognized by us that a party who does not appeal may not have a more favorable decision here than was obtained in the trial court. Robbins v. Beatty, 246 Iowa 80, 93, 67 N.W.2d 12, 19, and citations; Alberhasky v. Alberhasky, 250 Iowa 986, 999, 97 N.W.2d 914, 922; Kellerhals v. Kallenberger, 251 Iowa 974, 103 N.W.2d 691, 692; Schlotfelt v. Vinton Farmers Supply Co., 252 Iowa 1102, 1115, 109 N.W.2d 695, 702; Randolph Foods, Inc. v. McLaughlin, 253 Iowa 1258, 1277, 115 N.W.2d 868, 879.

Every case cited was, like this, in equity, reviewable here de novo. The exception to the above rule In re Larson's Estate, 256 Iowa 1392, 1403, 131 N.W.2d 503, 509, points out clearly has no application here.

III. Because of the approach taken to this case it seems well to point out some of the fundamental rules that govern it.

Rule 344(f) 15, Rules of Civil Procedure, provides it is deemed so well established that authorities need not be cited for the proposition, "In child custody cases the first and governing consideration * * * must be the best interest of the child."

However, repeated Iowa decisions have elaborated somewhat upon this rule. Perhaps Alingh v. Alingh, 259 Iowa 219, 225, 144 N.W.2d 134, 138, does so most succinctly. After referring to the rule, the opinion proceeds: "All other considerations must yield to the best interests of the children. Their welfare is superior to the claim of anyone. Thein v. Squires, 250 Iowa 1149, 1157, 97 N.W.2d 156, and cases cited therein. 15 A.L.R.2d 432, 435."

Halstead v. Halstead, 259 Iowa 526, 531, 144 N.W.2d 861, 864, approves and quotes from Aligh. The Halstead opinion is fortified by more authority on propositions applicable here than any decision found.

Herron v. Herron, 258 Iowa 1052, 1053–1054, 141 N.W.2d 562, 563, states the rule above quoted and adds: "The welfare of the child is superior to the claim of either parent and the wishes of the parents are entitled to little if any consideration. (citations)."

Burrell v. Burrell, 256 Iowa 490, 495, 127 N.W.2d 78, 81, approves this from Neve v. Neve, 210 Iowa 120, 126, 230 N.W. 339, 341: "Their (children's) best interest is paramount to the rights' of either father or mother."

Two justices dissented from the Halstead opinion, one in a separate opinion, and two from Thein v. Squires. All concurred in all other opinions cited. A long list of precedents to like effect might be added.

We have held many times child custody provisions of a divorce decree will not be modified unless their enforcement will be attended by positive wrong or injustice as a result of the changed conditions. Welch v. Welch, 256 Iowa 1020, 1024, 129 N.W.2d 642, 644, and citations; Smith v. Smith, supra, 257 Iowa 584, 589, 133 N.W.2d 677, 682; Maikos v. Maikos, 260 Iowa 382, 147 N.W.2d 879, 881 and citations; Brown v. Brown, Iowa, 155 N.W.2d 426, 428.

After stating this rule, the Brown opinion concludes "There is no such change of circumstances here." In the present case no one has claimed or suggested there has been any such change of circumstances.

Another applicable rule is important in view of appellees' brief and argument. " 'Where the right of custody has not been adjudicated it will be presumed, in the absence of evidence to the contrary, that a child's welfare will best be served by committing it to the custody of a parent. This presumption is resorted to merely to aid the court in determining what is for the best interests of the child.' This presumption does not prevail where there has been a prior custody decree. In such cases the presumption is in favor of the prior decree. Thein v. Squires, supra, (250 Iowa 1149, 97 N.W.2d 156 loc. cit. 1157, 1158)." Alingh v. Alingh, supra, 259 Iowa 219, 226, 144 N.W.2d 134, 139.

Thus at the hearing now under review the presumption was that the child's welfare would be best served by placing him with one or the other set of grandparents so he could attend school permanently in their home town as the first custody decree provided. This is not to say custody could not be changed to the mother if it were shown there was a change of circumstances such that the boy's best interests require or make expedient the award to her. As before stated, the decree holds it is obvious that as between the two sets of grandparents custody would have to be awarded to the Alexes.

IV. It is true, as the mother alleges in the application she and her parents filed, there has been a change in her personality, behavior, and mental and physical condition in that she has married a successful businessman and become the mother of twin boys. The trial court found, as previously explained, improvement in the

mother could be traced in large part to her remarriage. However, it is believed these facts do not constitute such a change of circumstances that the boy's welfare requires or makes expedient awarding his custody to her.

These matters, as well as the numbered "changes in circumstances" set out at the end of the majority's Division VI "as showing Bonnie's present emotional maturity," bear on her fitness to have the boy, but only remotely, if at all, on whether by reason thereof his welfare requires placing him in Tucson with his mother. As before stated, fitness of the mother does not establish that the boy's best interests require the desired custodial award. This is implicit in our holdings in Halstead v. Halstead, supra, 259 Iowa 526, 534, 144 N.W. 2d 861, 865; Painter v. Bannister, 258 Iowa 1390, 1393, 140 N.W.2d 152, 154; ("We are not confronted with a situation where one of the contesting parties is not a fit or proper person.") and many others under generally similar facts.

We have held several times remarriage of one or both divorced parents is insufficient to call for a change of custody provisions of the decree. In apparent recognition of these precedents the majority asserts the results of the remarriage, not the remarriage alone, permit the court to change the boy's custody. This seems to be a mere play on words. In any event, a number of our decisions hold remarriage accompanied by such results as are claimed here do not dictate a change of child custody. *And no precedent has been cited that supports the decision appealed from under comparable facts.*

Under generally similar facts Scheffers v. Scheffers, 242 Iowa 563, 569–570, 47 N. W.2d 157, 160–161, reverses a change of custody to the mother. These are excerpts from the opinion:

"The weakness of defendant's case * * is not that there are no changed circumstances since the divorce but that circumstances have not so changed that the welfare of the child 'demands' (as several of our decisions say) or renders 'expedient' (as Code section 598.14 I.C.A. states) the desired change of custody. Defendant is doubtless in better material position to give Freddie a home now than when the divorce was granted. While this is a changed circumstance it does not entitle defendant to relief unless the best interests of the boy would thereby be served." (citations)

"We are not persuaded it is for his best interests to award Freddie's custody to defendant. * * *"

"It is not shown that the home of plaintiff and his mother is less desirable for the child than it was when the divorce was granted. In fact it appears it is fully as desirable as it was then. * * *"

"The father and grandmother have taken good care of the child. There is no reason to think they will not do so in the future. Freddie has grown strong, healthy and contented. He has attended Sunday school regularly. Strong bonds of affection have grown between the father, grandmother and child during the four years since defendant left plaintiff and the child. To take the child from his present home and place him with defendant would be an experiment which should not be made under the showing here. * * *"

"We have approved this statement which is applicable here: ' "When a child is legally placed in a home where it receives good treatment and moral training, it should never be removed from that home, except for the most cogent reasons." ' (citations)"

Scheffers v. Scheffers has been followed many times. McCrery v. McCrery, supra, 258 Iowa 354, 357, 138 N.W.2d 876, 878 quotes the first sentence from the above excerpt.

York v. York, supra, 246 Iowa 132, 136–137, 67 N.W.2d 28, 31, briefly reviews several prior opinions and continues with lan-

guage applicable here: "We pointed out in Bennett v. Bennett (200 Iowa 415, 203 N. W. 26) and Dow v. Dow (240 Iowa 145, 35 N.W.2d 853) that although the mother was in better circumstances than at the time of the original decree, that fact alone was not sufficient change of conditions and circumstances under the statute as would warrant the modification of the custodial provision of that decree. * * *"

"Here the record fails, we think, to show any change in circumstances or conditions directly related to the care of the children. We held in the Dow case [at page 151 of 240 Iowa, 35 N.W.2d 853] that the 'trial court was right in not changing an order that gave the father custody, upon a showing that the mother had remarried and established a home and had financial ability to support the child.' The case before us is strikingly similar for here also the only real change of conditions and circumstances shown is the remarriage of the defendant-mother. *The change from a condition of being without funds, ill, and without a place to care for the children, to a housewife, married, with a home with suitable facilities to rear children, is a change of circumstances and conditions, but relates to the defendant rather than the children.*" (emphasis added)

York v. York also reverses the trial court and it too has been repeatedly approved. See e. g. Rahn v. Cramer, 249 Iowa 116, 120–121, 85 N.W.2d 924, 926–927.

The present case is stronger for appellants than was appellants' claim to a reversal in Thein v. Squires, supra, 250 Iowa 1149, 1158–1160, 97 N.W.2d 156. Although the mother of the two children there had not remarried, she was an alcoholic guilty of occasional immoral contact when the divorce was granted. She refrained from use of liquor and immoral conduct and otherwise properly demeaned herself during the two and one third years before trial of her application asking custody of the children. A number of witnesses testified in person, rather than by deposition as here, to her reformation and exemplary conduct. There was also complaint as to the care shown the children who were divided between two families with whom the father had placed them. As stated, there is no claim here the child has not been properly cared for nor as to the character and fitness of the Alexes. We reversed the award of custody to the mother in Thein, saying "To do so would be in the nature of an experiment which should not be made upon the showing here. There is no reason to think the children will not be as well cared for by defendants in the future as they have been in the past."

This from the Thein opinion applies here:

"In its broad outlines this case finds its counterpart in a good many that have come before us in recent years where, due to the inability or unwillingness of one or both parents to make a desirable home or provide good care for a young child, it is placed with a third person. After an extended period the parent's situation is changed so he or she can probably provide a good home for the child and its custody is demanded. Almost without exception, with little disagreement among the members of the court, we have held the change in the situation of the parent demanding the child's custody is insufficient basis for disturbing the existing custodial arrangement. In few of our cases have the living arrangements sought to be changed existed for such an extended period as we have here. (Citing 10 Iowa decisions.) Many other decisions might be cited."

Although two justices dissented from the Thein opinion, at least seven later Iowa opinions cited it with approval, including Wendel v. Wendel, 252 Iowa 1122, 1126–1127, 109 N.W.2d 432, 434–435, written by the writer of the dissent in Thein, and concurred in by all who took part in the decision. See too Alingh v. Alingh, supra, 259 Iowa 219, 144 N.W.2d 134.

These excerpts from Halstead v. Halstead, supra, 259 Iowa 526, 531, 538, 144 N.W.2d 861, 864, 867, respectively, are also pertinent here:

"Also, if the person having lawful care of a child at the time its custody is sought to be changed has properly provided and supervised its social, moral and educational needs for a substantial period of time, and the child has become attached to the environment and the people who have made possible the happiness, security and comfort of its early years, a court is not justified in transferring that custody to another except for the most cogent reasons. (citations) * * *"

"Too many times in his short life this lad has been subjected to the severe emotional experience of being shunted from one home to another for no reason attributable to him or these respondents. Grant of custody to petitioner would only serve to expose him to the hazards of another and possibly more severe physical and mental upheaval than he has encountered in the past. (citations)"

V. Some matters of evidence should be mentioned. While the decree commends the paternal grandparents for adhering to the provisions of the original decree regarding the split custody, it is significantly silent as to any such praise of appellees. When each of the two five-months periods the boy was in Tucson came to an end, the Alexes went there to bring him back to Coon Rapids, a round trip of some 2700 miles. On one occasion Mr. Vaughn was at home, knew Mr. Alex was in his home to get the boy, but did not take the trouble to greet him or even see him.

Although the original custody decree found the mother was not then equipped emotionally to be entrusted with the boy's care and custody and provided her parents should have such responsibility commencing 10 days after the decree was entered, they left it to their attorney—doubtless a stranger to the boy—to take him from Coon Rapids to the airport in Omaha and deliver him to the mother to be flown to Tucson. Mr. and Mrs. Vaughn and Bonnie were then fully aware of the terms of the first custody decree placing their grandson in the care of the Vaughns.

The decree now under review found that at the time of the first submission of the custody question the mother demonstrated a depressing amount of emotional immaturity manifested as a lack of reality. She herself testified at the second hearing she was not herself at the time of the prior hearing, just before the boy was placed in her care for the flight to Tucson.

It appears without dispute that when the Alexes were getting Jett ready for his first five-months stay in Tucson he cried constantly and didn't want to go. This also happened when appellees' attorney came for the boy November 1, 1966 for his second five-months stay in Tucson. It is also shown without dispute that when Mr. and Mrs. Alex went to Tucson to return to the boy to Iowa at the end of his first stay he jumped in Mrs. Alex's arms and wouldn't let go. At Mr. Alex's suggestion the boy then kissed Mrs. Vaughn but refused to kiss his mother goodbye.

Further, Bonnie lived with her parents during the first five-months period Jett was in Tucson and they delegated to her the care of the boy which the trial court found they were willing to assume. Both parents so testified. During part of the time the Vaughns were in Los Angeles. This was not only a violation of the terms of the decree but was done without asking or obtaining consent of either the court or their attorney.

When time came to bring the boy to Tucson for his second five-months stay the Vaughns again delegated the task to their daughter and their attorney who again delivered Jett to her at the Omaha airport. And throughout this second (and last) stay in Tucson the Vaughns permitted Jett to live full time with his mother, to whom the

court had denied custodial rights, and her second husband in the latter's home. This was also done without asking permission of the court or even of their attorney and without informing the Alexes.

It clearly appears the testimony of Mr. Vaughn in this regard was less than honest. He said the boy lived in the Laos home only 50 percent of the time and refused to admit the truth which Mr. Laos, to his credit, divulged in his testimony. It was evidently the purpose of appellees to conceal the truth because of knowledge the terms of the decree had not been observed.

It is noted, too, that under the decree appealed from this boy would live permanently in a home with children from three sets of parents during the time Mr. Laos' son by his prior marriage was there. Such a situation is frequently undesirable and not conducive to the welfare of the children.

Upon the trial Grandmother Alex was criticized by claiming she did not write Bonnie during Jett's first stay in Arizona. Bonnie testified: "The first time Jett was in Arizona Florence didn't write me once. I was very upset." When shown a letter written *by her* to the Alexes May 11, 1966, it developed the letters and cards from Mrs. Alex were addressed to Jett, then three and a half, rather than to Bonnie, but were received at the Vaughn home where the three appellees then lived. It is obvious the child's mother, who cared for the boy, would read the letters and cards addressed to Jett, if they were not ignored.

The May 11th letter read: "Dear Family: Thank you for all your lovely cards and letters. *High Mom*, thank you for my ginger bread man. * * *. Jett." (emphasis added) Finally, on redirect examination Bonnie testified "Florence wrote Jett when he was in Tucson the first time but she never wrote personally to me. *I never wrote Florence either.*" It would seem the basis for Bonnie's criticism of Grandmother Alex was rather thin.

Incidentally, it also developed from Bonnie's testimony her second husband then had no office in the building marked with an "X" on the postcard she sent the boy in Iowa as explained in Division I, supra.

The above matters are mentioned insofar as they may bear on the vital question whether sending this boy to Tucson to live permanently will clearly serve his best interests. They also bear on the credibility of appellees as witnesses and the weight their testimony fairly deserves, also on what is considered infra.

VI. I cannot agree appellants' contention so summarily rejected in Division VIII is well answered by what is quoted from Vanden Heuvel v. Vanden Heuvel, 254 Iowa 1391, 1403–1404, 121 N.W.2d 216, 223, the only authority cited in appellees' brief on this issue. The brief asserts, and the excerpt from Vanden Heuvel indicates, the rule it is against the policy of the law to permit removal of a child from the jurisdiction unless its welfare would be served thereby, and ordinarily custody should not be awarded to a nonresident, is usually applied where divided custody is considered, where one party lives outside the state, and by permitting the child to be taken there litigation may arise to obtain its return. To this the brief and the Vanden Heuvel quotation add "No such situation is here contemplated."

The last quoted statement was true in the cited case but obviously is not true here. Quite the contrary, that *is* the situation here. The decree clearly provides for divided custody between a parent in Tucson and grandparents in Iowa. Further, the appellees have not observed the terms of the first decree and there is no definite assurance they would observe the terms of this one. In Vanden Heuvel both parents had lived in Michigan, the child was born there, the divorce was procured there *by the wife who was awarded custody of the child.* At the urging of the husband the wife had taken the child to his parents in Iowa to be kept temporarily during the

wife's illness, with assurance she could have the child when she recovered from her illness and was able to adequately care for him. After recovering from her illness her request for return of the child was denied and her action in habeas corpus followed.

Here the parents lived in Iowa, the divorce was procured here by the husband and the wife, as well as the husband, was denied custody of the child. As pointed out in Division III, supra, the wife was not entitled to the presumption—applicable in Vanden Heuvel—that the child was better off in the care of the mother.

It is unnecessary to cite the many Iowa decisions which recognize the rule stated at the beginning of this division. See citations in the Vanden Heuvel opinion, supra, at page 1403 of 254 Iowa, page 223 of 121 N.W.2d. The mother's intention to remove the child from Iowa gave us "some concern" in Vanden Heuvel. Many other precedents which support the rule in question include Herron v. Herron, supra, 258 Iowa 1052, 1062, 141 N.W.2d 562, 568, and Brown v. Brown, supra, Iowa, 155 N.W.2d 426, 428. See 27B C.J.S. Divorce § 313.

It is hoped enough has been said to demonstrate appellees failed to establish by a preponderance of the evidence this little boy's welfare requires or makes expedient taking him from his grandparents' home in Iowa and placing him with his mother and her second husband in Tucson.

I would reverse, giving the mother the right to have the child not more than one month each summer and not over a week every other Christmastime.

RAWLINGS, J., joins in this dissent.