**Joseph G. HUFFMAN, Appellee,**

v.

**Elizabeth Ann HUFFMAN, Appellant.**

No. 54050.

Supreme Court of Iowa.

May 5, 1970.

Reimer & Vipond, Denison, for appellant.

L. V. Gilchrist, Denison, for appellee.

MASON, Justice.

In this appeal defendant Elizabeth Ann Huffman, now Elizabeth Hartman, seeks reversal of the trial court's order denying her petition for modification of that part of an existing divorce decree governing custody of the child born of her marriage to Joseph G. Huffman, plaintiff.

The Huffmans were married December 19, 1964, when Elizabeth was 15. The following March they moved to Denison and lived in a trailer court. Annette, the daughter involved, was born April 24, 1966. When the parties separated in February 1967 plaintiff took Annette to the home of defendant's parents in Lincoln, Nebraska.

February 20 plaintiff filed petition for divorce alleging defendant had been guilty of adultery. May 2 a default decree was entered granting plaintiff a divorce and custody of Annette. In its decree awarding plaintiff custody of the child, the court provided the mother should have reasonable visitation rights and retain jurisdiction to enter further orders relating to such rights.

Both parties have remarried; defendant married Donald J. Hartman November 18, 1967, plaintiff married his present wife June 1, 1969. The following day plaintiff took Annette from the maternal grandparents' home.

In her petition for modification filed July 22, 1969, defendant alleged she was only 17 at time of the divorce, had no property or source of income or a home in which to care for the child; at the time of decree she was in a distraught mental state resulting from conditions of her marriage and had then been recently released from the mental health institute at Cherokee to which she had been committed involuntarily on an information signed by plaintiff.

She further asserts she is now almost 20 years of age, more mature, in good mental condition, fit to have custody of the child, married and her husband has a suitable home and adequate income to care for the child.

She states that because of these changed conditions since the date of decree it would be for the best interest of the child that her custody be awarded to defendant. August 28 defendant amended her petition alleging that by virtue of facts occurring since the date of the decree and facts concealed from the court by plaintiff at time of the decree plaintiff is not now a fit person to have custody of Annette; plaintiff's present wife is 18 years of age, immature and incapable of giving the child proper adult care and supervision. She further contends Annette is now being raised in a home in which derogatory remarks are made to her concerning her mother and is being taught to dislike defendant.

Answering defendant's petition as amended plaintiff denied subsequent conditions have so changed that the child's welfare requires or at least makes expedient such modification. He declared that when the trial court granted the divorce it was aware the child was living temporarily with de-

fendant's parents across the street from plaintiff's parents in Lincoln, Nebraska. The record of plaintiff's testimony bearing on this point and his intention to have Annette with him in the event he remarried is set out in plaintiff's answer.

In her reply defendant admits plaintiff testified at the divorce hearing that he had told the maternal grandparents their custody of Annette was only temporary and told the court if he remarried he intended to have the child in his own home.

The court denied defendant's petition for modification of the provision governing Annette's custody but amended the decree by giving her visitation rights in the Lincoln, Nebraska, home of her mother from 12 noon to 6 p. m. every other Sunday providing defendant notify her mother of her planned arrival so the grandmother in turn could notify plaintiff.

I. Defendant maintains in propositions relied on for reversal that she had shown by a preponderance of evidence conditions had so materially changed since entry of the decree that the child's welfare now requires modification granting Annette's custody to her natural mother and the court erred in not so finding and concluding.

Our review in this equitable proceeding is de novo. Rule 334, Rules of Civil Procedure.

"In matters involving child custody provisions of a divorce decree, best interest of the child is first and governing consideration. Authorities need not be cited for this. Rule 344(f)15, Rules of Civil Procedure. Child custody provisions of a divorce decree are final as to circumstances existing at time of entry of original decree. Such provisions will be modified only where applicant for modification proves by a preponderance of evidence that subsequent conditions have so changed that child's welfare requires, or at least makes expedient, such modification. * * * [Citing authorities].

" ' "[E]xisting circumstances" are those known or which with reasonable diligence should have been known to the parties and to the court at the time of the entry of the original decree; that is to say, those which are within the contemplation of the litigants and the court when the decree was entered.' * * * [Citing authority].

"Of course, not every change of circumstances is sufficient basis for modification of a divorce decree. * * * [Citing authorities].

"Changed circumstances relied upon to obtain modification of child custody provisions of a divorce decree must be such as were not within the knowledge or contemplation of the court when decree was entered and must be 'more or less' permanent or continuous, not merely transitory, variable or temporary, and where a change of financial condition of one or both of the parties is relied upon as a basis for modification it must be substantial. * * * [Citing authorities]." Alex v. Alex, 161 N.W.2d 192, 194–195 (Iowa 1968). See also Norenberg v. Norenberg, 168 N.W.2d 794, 796–797 (Iowa 1969).

There is no issue as to defendant's contention plaintiff concealed facts from the court which requires a change in Annette's custody in view of defendant's admission in reply, previously mentioned.

As bearing on her contention conditions have so changed since the date of the decree it would be for the best interest of Annette that her custody be awarded to defendant, we said in Harwell v. Harwell, 253 Iowa 413, 417, 112 N.W.2d 868, 871, in somewhat different language:

" * * * The 'circumstances' existing at the time of the original decree are those known to the court and to the opposing party, or which could have been discovered by the exercise of reasonable diligence. We think our interpretation of a change in circumstances must be held to mean a a change in 'known' circumstances including those which could have been known by the use of reasonable diligence. The rule is thus stated in 27B C.J.S. Divorce § 317(2), pages 538, 539: 'The discovery of material facts existing but unknown to the court or the discovery of material facts existing, but unknown to a party, at the time the decree was entered, which facts could not have been then ascertained with reasonable diligence, and which, if known to the chancellor, would have impelled him to enter a different decree, may also justify a modification of the custodial decree.'

"In Crockett v. Crockett, 132 Iowa 388, 391, 106 N.W. 944, 946, we followed this rule: 'And in the light of the statute, and giving construction thereto, we have held repeatedly that a decree fixing custody * * * is conclusive, unless it shall be made to appear that by reason of some change of circumstances or condition not known to, or within the contemplation of, the court, an enforcement of its decree will be attended by positive wrong or injustice.' " See also Pucci v. Pucci, 259 Iowa 427, 433, 143 N.W.2d 353, 357–358, and authorities cited.

Apparently Elizabeth has changed since the divorce. She has finished high school, is now employed, is married to the man with whom she was accused of having committed adultery while married to plaintiff, has a home and a husband with means to support Annette. However, our review of the record fails to disclose any subsequent change in circumstances that was not contemplated by the court on May 2, 1967, or evidence any enforcement of the existing decree will be attended by positive wrong or injustice, which requires that Annette's custody be changed for her best interest and welfare, with the possible exception of the conduct of plaintiff's father which gave the trial court concern.

II. In support of her allegation Annette is now being raised in a home in which derogatory remarks are made concerning defendant and the child is being taught to dislike her mother, defendant offered evidence that on at least two occasions plaintiff's father instructed Annette to tell de-

fendant she was a harlot and going to hell. On the Saturday before trial on the modification proceeding the elder Mr. Huffman called defendant a whore, a harlot and an adulteress in Annette's presence.

Further narration of facts is required for a consideration of this problem. After divorce plaintiff moved from Crawford County to Lincoln, Nebraska, and lived with his parents in a two-story house. There are two bedrooms and a bath upstairs, a bedroom, dining room and kitchen on the main floor. Since his remarriage plaintiff, Mrs. Huffman and Annette have lived in this home which they rent from the father for $50 a month with the father reserving the right to use a bedroom for himself and plaintiff's stepmother whenever they are home. Annette occupies an upstairs bedroom.

Plaintiff's father is 65. Before plaintiff rented the house, his father was a carpenter and also pastor of the Penticostal Church which he started about seven or eight years before trial. Since resigning as pastor, Mr. Huffman has been traveling quite a bit, doing evangelizing, going from church to church and holding special meetings. He has been to Oregon, Texas, Wyoming and Colorado. Plaintiff is a member of this church. Defendant was also raised in this faith but since her marriage to Hartman she has also attended another church.

Plaintiff describes his father as being "a little hard on sinners" with "a habit of calling a spade a spade as far as sin is concerned". His stepmother and defendant's mother are sisters.

The Saturday incident, previously mentioned, occurred about 5 p. m. September 27, 1969, two days before trial when defendant, her present husband, her two sisters and her mother went across the street to plaintiff's home to see Annette. Defendant and Hartman had just arrived from Slater, Iowa, where they now live. Defendant describes the events that followed. Annette was in the yard playing with her grandfather Huffman. They knew plaintiff would come home a little later; when he did defendant planned to ask if they could take Annette. While they were all on the porch plaintiff arrived home. Defendant rang the doorbell and asked plaintiff if they might take Annette for a while. Plaintiff said he and his wife were going downtown and had planned to take Annette with them. When defendant inquired whether they would be gone all evening plaintiff replied "probably not". About this time plaintiff's father appeared and said, "You get this creep [Mr. Hartman] out of the porch right now. I am going to get my shotgun. Get him off. * * *."

"He said he wouldn't trust Donald with a she dog of his and I was nothing but a whore and a harlot and my mother was just as bad and my sisters, because my mother let us in the house, that I was an adulteress and my mother was just as bad because she let us sleep in their beds." This was all said in Annette's presence.

Later defendant called plaintiff, asked if she could see Annette. Plaintiff told her they could, provided they stay at her parents' home. Defendant agreed and plaintiff brought the child over about 7 or 7:30. Defendant returned her about 10.

Plaintiff testified he didn't approve of his father's reference to his former wife as a harlot and prostitute and didn't believe anything could be accomplished by this type of conduct. There is some dispute in the testimony as to whether plaintiff and Annette were present on the porch while the incident took place.

Mrs. Ruby Jones, defendant's mother, gave her version of the occasion and asserts plaintiff did not leave with Annette until defendant and her family had left the porch.

Hartman added that grandfather Huffman said, "The rest of you sinners can leave, too, you whores and harlots."

Regardless of whether the episode on the Huffman porch actually took place in Annette's presence, the practice of these two families exhibiting their bitterness toward each other under the conditions before the court will not be allowed. Annette was so closely associated with the happening that it is difficult to imagine it would have any effect on her other than bad.

The circumstances before the court presented the question whether the grandfather's behavior and the possibility of its continuance required a change of Annette's custody.

In determining that it did not the trial court admonished plaintiff if his father continued to judge where defendant would be in eternity in the presence of Annette, it would be ground for change of her custody and warned plaintiff if his father's conduct in this respect were to continue the court would give plaintiff the choice of either moving out of the father's home or losing his child.

Regardless of Mr. Huffman's religious beliefs and practices, such manner of acting in front of a child less than four years old will be neither condoned nor tolerated by this court.

It is understandable that the grandfather might have a strong dislike for Hartman under the factual situation existing and probably did not care to have him at his home. However, expressing his contempt for either Hartman, defendant or both to Annette could not help but have a detrimental effect on the child. As suggested by plaintiff, no good can be accomplished by this type of conduct.

It was pointed out in written argument and plaintiff's testimony his father and members of his church try "to live according to the Bible". It might be well for the grandfather to consider the virtue of forgiveness and practice a little charity toward those whom he judges to be condemned.

It would be appropriate for counsel to advise their respective clients accordingly. Wells v. Wells, 168 N.W.2d 54, 60 (Iowa 1969).

In fixing visitation rights the court also cautioned defendant and her relatives about criticizing Annette's father and gave notice of the consequences. We approve the trial court's action.

■ The trial court correctly held defendant failed to prove by a preponderance of evidence that subsequent conditions had so changed since May 2, 1967, that Annette's welfare required or at least made expedient a change in the provision of the existing decree governing the child's custody. See Alex v. Alex, 161 N.W.2d 192 (Iowa 1968).

III. In view of the above holding we do not reach defendant's third provision relied on for reversal.

IV. Defendant contends in support of her fourth proposition that the decree for her visitation rights as modified by the order of September 29, 1969, is unduly restrictive and not in the best interest of the child.

The trial court determined that until the bitterness between the families involved is terminated, there can be no common meeting place. It then provided visitation rights as previously set out.

Defendant testified she had visited Annette every three or four weeks when she went to her mother's home in Lincoln.

■ In determining the extent of visitation rights, welfare of the child is the controlling consideration, is superior to the claim or convenience of either parent and is not to be allowed or denied to appease one or punish the other. Burrell v. Burrell, 256 Iowa 490, 495–496, 127 N.W.2d 78, 81–82, and authorities cited.

■ We are satisfied the trial court made a conscientious effort to fix defend-

ant's visitation rights under the facts presented in accordance with this guideline. We approve the modification as made.

The case is therefore—affirmed.

All Justices concur.